# 22-0249

## IN UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————————

WE THE PATRIOTS USA, INC.; CT FREEDOM ALLIANCE, LLC; CONSTANTINA LORA; MIRIAM HIDALGO; ASMA ELIDRISSI

*Plaintiffs-Appellants*,

v.

CONNECTICUT OFFICE OF EARLY CHILDHOOD DEVELOPMENT; CONNECTICUT DEPARTMENT OF PUBLIC HEALTH; BETHEL BOARD OF EDUCATION; GLASTONBURY BOARD OF EDUCATION; STAMFORD BOARD OF EDUCATION

*Defendants-Appellees*,

———————————

On Appeal from the United States District Court for the Connecticut, No. 3:21-cv-00597-JBA

———————————

## BRIEF OF THE PLAINTIFFS-APPELLANTS

———————————

Norman A. Pattis
Cameron L. Atkinson
383 Orange Street, 1st Floor
New Haven, Connecticut 06511
Phone: (203) 393-3017
Fax: 203-393-9745
Emails: npattis@pattisandsmith.com
catkinson@pattisandsmith.com

*Attorneys for Plaintiffs-Appellants*

April 15, 2022

## <u>FRAP 26.1 DISCLOSURE STATEMENTS</u>

Appellant – We The Patriots USA, Inc. – is a non-profit corporation that is not owned by any parent or publicly held company. No parent or publicly held company owns 10% or more of its stock.

Appellant – CT Freedom Alliance, LLC – is a Connecticut lobbying corporation that is not owned by any parent or publicly held company. No parent or publicly held company owns 10% or more of its stock.

## **TABLE OF CONTENTS**

FRAP 26.1 DISCLOSURE STATEMENTS.................................................................... i

TABLE OF AUTHORITIES .................................................................... vi

INTRODUCTION ....................................................................1

JURISDICTION....................................................................2

STATEMENT OF THE ISSUES....................................................................3

STATEMENT OF THE CASE....................................................................4

   I.   Background....................................................................5

      A.  Vaccines – Ingredients. ....................................................................6

      B.  Appellants We The Patriots USA, Inc. and CT Freedom Alliance, LLC.....6

      C.  Appellant Constantina Lora. ....................................................................7

      D.  Appellant Miriam Hidalgo. ....................................................................8

      E.  Appellant Asma Elidrissi....................................................................9

   II.   Procedural History....................................................................11

SUMMARY OF THE ARGUMENT ....................................................................11

ARGUMENT ....................................................................14

   I.   The District Court Erred By Dismissing The Appellants' Claims Against The State Agency Defendants And Denying The Appellants Leave To Amend. .......14

ii

A.  Standard of review......................................................................14

B.  The district court erred in dismissing the Appellants' claims against the state agency Appellees in Counts One through Four for lack of subject matter jurisdiction on Eleventh Amendment grounds..................................................15

C.  The district court erred in denying the Appellants leave to amend on the grounds that they had declined an opportunity to amend their complaint and that amendment would be futile. .......................................................16

II.    The District Court Erred By Dismissing The Appellants' – We The Patriots USA, Inc. and CT Freedom Alliance, LLC – Claims For Failing To Sufficiently Plead Associational Standing..................................................19

A.  Standard of review......................................................................19

B.  The district court erred in concluding that We The Patriots USA, Inc. and CT Freedom Alliance, LLC failed to properly plead associational standing because they did not allege specific members that were harmed by the newly amended Conn. Gen. Stat. § 10-204a. ..............................................19

III.   The District Court Erred By Dismissing The Appellants' Free Exercise Claims For Failure To State A Claim Upon Which Relief Can Be Granted........21

A.  Standard of review......................................................................21

B.   The district court erred in holding that Second Circuit precedent forecloses the Appellants' Free Exercise claim before conducting any evaluation of what scrutiny to use in its analysis of Conn. Gen. Stat. § 10-204a, as amended by Public Act No. 21-6. ..........................................................................21

C.   The district court erred in applying rational basis scrutiny to Conn. Gen. Stat. § 10-204a, as amended by Public Act No. 21-6.......................................27

D.   Conn. Gen. Stat. § 10-204a, as amended by Public Act No. 21-6, cannot survive strict scrutiny..........................................................................................40

IV.   The District Court Erred By Dismissing The Appellants' Medical Freedom And Privacy Claims For Failure To State A Claim Upon Which Relief Can Be Granted...........................................................................................................42

A.   Standard of review.......................................................................................42

B.   The district court erroneously concluded that the Fourteenth Amendment does not establish a right to medical freedom and privacy that can overcome a state's interest in mandatory vaccinations. .......................................................42

V.   The District Court Erred By Dismissing The Appellants' Equal Protection Claims For Failure To State A Claim Upon Which Relief Can Be Granted........46

A.   Standard of review.......................................................................................46

iv

B.   The district court erred by requiring the Appellants to successfully

demonstrate a Free Exercise claim before strict scrutiny could be applied to

their Equal Protection claim of age discrimination. ..........................................47

VI.   The District Court Erred By Dismissing The Appellants' Childrearing

Claims For Failure To State A Claim Upon Which Relief Can Be Granted........53

A.   Standard of review......................................................................................53

B.   The district court erred in holding that the Appellants' childrearing claim

failed because it was contingent on the vitality of their Free Exercise claim. ..54

VII.   The District Court Erred By Dismissing Appellant Elidrissi's IDEA Claim

For Failure To State A Claim Upon Which Relief Can Be Granted. ...................56

A.   Standard of review......................................................................................56

B.   The district court failed to draw all reasonable inferences in Appellant

Elidrissi's favor...................................................................................................56

CONCLUSION ......................................................................................................58

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

.............................................................................................................................60

CERTIFICATE OF SERVICE ............................................................................61

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alden v. Maine*, 527 U.S. 706 (1999) ................................................ 15, 16

*Benihana, Inc. v. Benihana of Toyko, LLC*, 784 F.3d 887 (2d Cir. 2015)........ 15, 19

*Brown v. Board of Educ.*, 347 U.S. 483 (1954).......................................52

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ...................................38

*Cantwell v. State of Connecticut*, 310 U.S. 296 (1940)...........................................48

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) .23, 28, 29, 31

*Close v. New York*, 125 F.3d 31 (2d Cir. 1997).......................................................15

*Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990)...........46

*Davis v. Beason*, 133 U.S. 333 (1890)......................................................................35

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...............................................39

*Employment Div. Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990) ................................................................................ 28, 33, 34, 37

*Everson v. Board of Education*, 330 U.S. 1 (1947) .................................................36

*Ex Parte Young*, 209 U.S. 123 (1908) ....................................................................16

*Faculty v. New York University*, 11 F.4th 68 (2021) ......................................... 15, 19

*Fraternal order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3rd Cir. 1999) ...............................................................................30

vi

*Fulton v. City of Philadelphia, Pennsylvania*, 141 S.Ct. 1868 (2021) . 29, 36, 38, 39

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006)

.................................................................................................................37

*Gregory v. Ashcroft*, 501 U.S. 452 (1990) ..............................................47

*Hans v. Louisiana*, 134 U.S. 1 (1890) ...................................................15

*Holt v. Hobbs*, 574 U.S. 352 (2015) ......................................................38

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) ....................................23

*Knight v. Connecticut Dept. of Public Health*, 275 F.3d 156 (2d Cir. 2001) ..........33

*Leebaert v. Harrington*, 332 F.3d 134 (2d Cir. 2003) ..................................... 33, 34

*Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307 (1976)...................................47

*Masterpiece Cake, Ltd. V. Colorado Civil Rights Comm'n*, 138 S.Ct. 1719 (2018)

.................................................................................................................38

*Phillips v. New York*, 775 F.3d 538 (2d Cir. 2015) ........................................ passim

*Pierce v. Sco'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510

(1925).................................................................................... 36, 46, 55

*Planned Parenthood v. Casey*, 505 U.S. 833 (1992)....................................... passim

*Plessy v. Ferguson*,163 U.S. 537 (1896) ................................................52

*Prince v. Massachusetts*, 321 U.S. 158 (1944)................................................. 23, 54

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015)................................................40

*Roe v. Wade*, 410 U.S. 113 (1973)............................................................ 25, 44, 45

vii

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996)......................................16

*Sherbert v. Verner*, 374 U.S. 398 (1963) ..................................................40

*Smith v. Hogan*, 794 F.3d 249 (2d Cir. 2015)...........................................15

*Summers v. Earth Island Institute*, 555 U.S. 488 (2009)........................19

*Tandon v. Newsom*, 141 S.Ct. 1294 (2021) ...........................................32

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012 (2017) .......38

*Troxel v. Granville*, 530 U.S. 57 (2000) .......................................... 36, 54

*United States v. Seeger*, 380 U.S. 163 (1965)...........................................35

*We The Patriots USA, Inc. v. Connecticut Office of Early Childhood Development*,

    2022 WL 105191 (D.Conn. Jan. 11, 2022) ...........................................4

*We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266 (2d Cir. 2021) ................. passim

*Williams v. Rhodes*, 393 U.S. 23 (1968)...................................... 47, 48, 49

*Wisconsin v. Yoder*, 406 U.S. 205 (1972)......................................... 33, 55

**Statutes**

20 U.S.C. § 1401 ......................................................................57

28 U.S.C. § 1291 .......................................................................2

28 U.S.C. § 1331 .......................................................................2

42 U.S.C. § 1983 .......................................................................2

Conn. Gen. Stat. § 10-204a ............................................................. passim

**Other Authorities**

38 C.F.R. 300.8 ...................................................................................57

Fed. R. Civ. P. 12 ......................................................................... passim

Fed. R. Civ. P. 15 ...............................................................................18

Fed. R. Civ. P. 8 .................................................................................56

Hon. Pierre N. Leval, *Judging Under The Constituion: Dicta About Dicta*, 81

    N.Y.U. L. Rev. 1249 (2006) ................................................................24

Luke W. Goodrich & Rachel N. Busick, *Sex, Drugs, and Eagle Feathers: An*

    *Empirical Study of Federal Religious Freedom Cases*, 48 Seton Hall L. Rev. 353

    (2018) ..................................................................................................37

Michael W. McConnell, *The Origins and Historical Understanding of Free*

    *Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990) .........................................38

**INTRODUCTION**

Education is the self-evident key to the American way of life. Americans rely on education to participate in the critical functions of self-government, including making informed voting decisions and serving on juries. They rely on education to provide the basic necessities of life for themselves and their families. Most importantly, they rely on education to live the American dream by providing a better life for their children than they had.

Despite the self-evident importance of education, Connecticut made a baffling policy choice in 2021. It chose to deny any form of public or private education to children whose parents object to vaccination on religious grounds. Connecticut also left no stone unturned to impose its vaccination policies – extending it to public and private daycares, pre-schools, schools, and colleges.

A generous interpretation of Connecticut law would limit the impact of this policy just to educational institutions, but a realistic interpretation draws back the curtain on an unconscionable policy objective: the wholesale denial of social and economic opportunities to those who hold sincere religious beliefs that do not permit them to receive vaccinations.

The First Amendment does not permit Connecticut to exercise its police power to systematically deny people of faith any opportunity to meaningfully

1

participate in society. Nor does it permit Connecticut to create a class of lesser citizens based on their religious beliefs.

Among the Appellants are three Connecticut parents – Constantina Lora, Miriam Hidalgo, and Asma Elidrissi - who now face an unconscionable choice between violating their religious beliefs and not educating their children. Two membership organizations – We The Patriots USA, Inc. and CT Freedom Alliance, LLC – joined them to represent the rights of their members who are similarly situated. They turned to the courts for relief and found it wanting before the district court, which granted the Appellees' motions to dismiss their claims. They now ask the Court to reverse the district court's decision and allow them to proceed on their claims.

## <u>JURISDICTION</u>

This is an appeal from a district court's dismissal of a civil action arising in the United States District Court for District of Connecticut on January 11, 2022. App.34. The Court has appellate jurisdiction under 28 U.S.C. § 1291. The district court had federal question jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 1983. The Appellants timely filed their notice of appeal on February 1, 2022. App.35-36.

## STATEMENT OF THE ISSUES

I.  Whether The District Court Erred By Dismissing The Appellants' Claims Against The State Agency Appellees For Lack Of Subject Matter Jurisdiction On Eleventh Amendment Grounds And Denying Them Leave To Amend.

II.  Whether The District Court Erred By Dismissing The Claims Of We The Patriots USA, Inc. and CT Freedom Alliance, LLC For Lack Of Associational Standing.

III.  Whether The District Court Erred By Dismissing The Appellants' Free Exercise Claims For Failure To State A Claim Upon Which Relief Can Be Granted.

IV.  Whether The District Court Erred By Dismissing The Appellants' Privacy And Medical Freedom Claims For Failure To State A Claim Upon Which Relief Can Be Granted.

V.  Whether The District Court Erred By Dismissing The Appellants' Equal Protection Claims For Failure To State A Claim Upon Which Relief Can Be Granted.

VI.  Whether The District Court Erred By Dismissing The Appellants' Child Rearing Claims For Failure To State A Claim Upon Which Relief Can Be Granted.

VII.    Whether The District Court Erred By Dismissing Appellant Elidrissi's IDEA

Claim For Failure To State A Claim Upon Which Relief Can Be Granted.

## STATEMENT OF THE CASE

In this case, two membership organizations – We The Patriots USA, Inc. and CT Freedom Alliance, LLC – and three Connecticut parents – Constantina Lora, Miriam Hidalgo, and Asma Elidrissi – (collectively, "the Appellants") seek declaratory and injunctive relief against the Connecticut Office of Early Childhood Development, the Connecticut State Department of Education, the Connecticut Department of Public Health, the Bethel Board of Education, the Glastonbury Board of Education, and the Stamford Board of Education (collectively, "the Appellees") to prevent them from enforcing Conn. Gen. Stat. § 10-204a, as amended by Public Act No. 21-6, which eliminated religious exemptions to Connecticut's vaccination requirement for children and adults who attend public and private Connecticut schools, preschools, daycares, and colleges. The Appellants filed the underlying action in the United States District Court for the District of Connecticut. Judge Janet Bond Arterton granted the Appellees' motions to dismiss the Appellants' complaint in its entirety via a written decision. *See We The Patriots USA, Inc. v. Connecticut Office of Early Childhood Development*, 2022 WL 105191 (D.Conn. Jan. 11, 2022). This appeal followed.

4

## I.   Background.

Prior to April 28, 2021, Connecticut required school children to obtain certain vaccinations before it permitted them to attend schools and pre-schools. App.3. It, however, allowed them and their parents to claim both medical and religious exemptions to the vaccination requirements. App.3.

On April 28, 2021, Connecticut Governor Ned Lamont signed what is now known as Public Act No. 21-6 into law, which amended Conn. Gen. Stat. § 10-204a to eliminate the option for children and their parents to request a religious exemption to Connecticut's vaccination requirements. App.40, ¶ 17. It, however, preserved the medical exemption previously permitted under Connecticut law. App.41, ¶ 18. The newly amended Conn. Gen. Stat. § 10-204a did not distinguish between public, private, or religious schools, pre-schools, daycares, and colleges. App.40, ¶ 17. It set a deadline of September 1, 2022 for parents to bring their children into compliance with the new law and to submit proof of vaccination to their schools. App.40, ¶ 17.

The newly amended Conn. Gen. Stat. § 10-204a did contain a narrow religious exception though. It does not require parents of children enrolled in kindergarten through grade 12 to vaccinate their children if they had an existing religious exemption on file with their schools prior to April 28, 2021. App.40, ¶ 17.

5

**A. Vaccines – Ingredients.**

A vaccine consists of several distinct parts: "a virus (or a component of a virus), a liquid buffer, contaminants from the cell line used to manufacture it, commercial stabilizer, and other additives." App.41, ¶ 20. For instance, porcine gelatine – a derivative of pork – is used as a stabilizer in certain vaccines. App.44, ¶ 39.

Additionally, pharmaceutical companies use cell lines artificially developed from aborted fetuses to research, develop, test, and produce their vaccines. App.41, ¶ 22. As of February 2020, the United States Center for Disease Control and Prevention (CDC) listed ten manufactured vaccines that contain human fetal cells. App.41, ¶ 23.

Since it is physically impossible to remove all cell line contaminants from a vaccine dosage, it is impossible to remove human fetal cells and DNA from vaccines manufactured using cells artificially developed from aborted fetuses. App. 41, ¶ 21. The presence of very small amounts of human fetal cells and DNA in the human blood can create a very strong autoimmune reaction in a person by which a person's body turns against itself and starts killing its own cells and tissues. App.42, ¶ 24.

**B. Appellants We The Patriots USA, Inc. and CT Freedom Alliance, LLC.**

Appellant We The Patriots USA, Inc. is a nonprofit public charity organized and operated exclusively for tax-exempt purposes. App.37-38, ¶ 2. It promotes

6

constitutional rights and other freedoms through education, outreach, and public interest litigation. App.38, ¶ 2. As a Section 501(c)(3) public charity, it has members who participate in its tax-exempt activities as volunteers and community stakeholders who bring and support litigation in federal and state courts on issues that directly affect their rights and interests. App.38, ¶ 2. It counts a significant number of Connecticut parents affected by the newly amended Conn. Gen. Stat. § 10-204a among its members. App.38, ¶ 2.

Appellant CT Freedom Alliance, LLC is a public interest organization that lobbied against the newly amended Conn. Gen. Stat. § 10-204a and brings litigation in various courts on a variety of matters. App.38, ¶ 3. Most of its members are parents affected by Conn. Gen. Stat. § 10-204a. App.38, ¶ 3.

### C. Appellant Constantina Lora.

Appellant Constantina Lora is a devout Greek Orthodox believer and the parent of one pre-schooler in Bethel, Connecticut, who is now subject to Conn. Gen. Stat. § 10-204a. App.42, ¶ 25. She and her husband decline vaccines on two religious grounds. App.42, ¶ 26.

First, they believe that

to use or benefit from the use of aborted fetal cells is morally wrong and would constitute participation in what they feel was an act of intentional, premeditated murder of another human being. They also personally believe that injecting themselves with cells from other animals and chemicals – which are present in all vaccines – is morally wrong.

7

App.42, ¶ 27. Second, they believe "that harming a child is morally wrong, and they believe that vaccinating their children would harm them, thus rendering it wrong." App.42, ¶ 28.

Ironically, Lora and her husband left New York approximately two months before Connecticut amended Conn. Gen. Stat. § 10-204a because New York repealed its religious exemption to its school vaccination requirements. App.42, ¶ 29. Lora's husband now commutes three hours to work every day because they refused to abandon their religious beliefs in the face of New York's disrespect for them. App.42, ¶ 29.

The Loras' oldest two children were able to keep their religious exemptions under Conn. Gen. Stat. § 10-204a, but their youngest child will not receive one due to Conn. Gen. Stat. § 10-204a. App.43, ¶ 30.

**D. Appellant Miriam Hidalgo.**

Miriam Hidalgo is a Connecticut parent with two small children who were eligible for daycare prior to April 28, 2021 and were eligible for preschool in the fall of 2021 in Glastonbury, Connecticut. App.43, ¶ 31. She and her husband are devout Catholics, and they decline vaccinations on two grounds. App.43, ¶ 32. "First, they personally believe that to use or benefit from the use of aborted fetal cells is morally wrong and would constitute participation in what they feel was an act of intentional, premeditated murder of another human being." App.43, ¶ 33. Second, they have

agreed to raise their children as vegans – a decision that comes from Miriam's personal religious beliefs. App.43, ¶ 34. Thus, they believe that injecting their children with cells from other animals such as pigs is morally wrong. App.43, ¶ 34.

The Hidalgos operate three small businesses to support themselves and their family. App.43, ¶ 35. While Miriam has dedicated herself to being a stay-at-home mother, she still has responsibilities pertaining to those businesses. App.43, ¶ 35. Thus, homeschooling their children would place an overwhelming burden on her. App.43, ¶ 35.

**E. Appellant Asma Elidrissi.**

Asma Elidrissi is a Connecticut parent with two small children who are currently eligible for daycare and preschool and one of whom needed to register for kindergarten in the fall of 2021 in Stamford, Connecticut.[1] App.38-39, ¶ 6. She and her husband are immigrants to the United States, and they are devout Muslims who decline vaccinations on three religious grounds. App.44, ¶¶ 36-37.

"First, they personally believe that to use or benefit from the use of aborted fetal cells is morally wrong and would constitute participation in what they feel was an act of intentional, premeditated murder of another human being." App.44, ¶ 38.

---

[1] Asma and her husband could not complete their child's registration before the newly amended Conn. Gen. Stat. § 10-204a took effect, thus missing the opportunity to "grandfather" at least one of their children into the old religious exemption regime. App.44, ¶ 36.

Second, they abstain from pork in accordance with the well-established Muslim religious prohibition on consuming pork. App.44, ¶ 39. Porcine gelatine – a derivative of pork – is used as a stabilizer in certain vaccines, including ones that the Appellees will require. App.44, ¶ 39.

Finally, Asma and her husband hold the sincere religious belief that harming children is morally wrong, and they unfortunately have personal experience with such a disaster. App.44, ¶ 40. Relying on a doctor's assurance that vaccines posed no harm to their children and that they had no products barred by her religion, Asma and her husband allowed their son to receive a measles, mumps, and rubella (MMR) vaccination. App.44, ¶ 40. He incurred serious health problems and ultimately developed a speech and learning disorder for which he now requires special educational services. App.44, ¶ 40. After fully informing themselves, Asma and her husband found that their doctor misled them, and they now decline vaccines as a matter of faith. App.44, ¶ 40.

Asma and her husband are not wealthy, and both are working parents at a small business that they own. App.45, ¶ 41 Asma currently needs to return to work to supplement their income so they can provide their children with a full and fair chance at the American dream that they have come to the United States to pursue. App.45, ¶ 41. If their children cannot attend any school or day care – public or private, Asma will be unable to return to work. App.45, ¶ 41. Relocation is not an

10

option for them either as they have put down deep roots in Connecticut, including starting and running a business in the state. App.45, ¶ 41.

## II.     Procedural History.

The Appellants filed the underlying action on April 30, 2021. App.37. The Appellees filed their motions to dismiss on July 29, 2021. App.128-135. Judge Arterton heard oral argument on October 27, 2021. App.149, Dkt. 54. On January 11, 2022, Judge Arterton issued an order granting the Appellees' motions to dismiss in their entirety. App.1. Final judgment entered on January 12, 2022. App.34. The Appellants filed their notice of appeal on February 1, 2022. App.35.

## SUMMARY OF THE ARGUMENT

The Appellants divide their arguments between two procedural questions and five substantive ones, and they ask the Court to reverse the district court's decision granting the Appellees' motions to dismiss in its entirety.

The procedural issues are relatively simple. First, the Appellants named Connecticut state agencies as defendants instead of the agencies' respective heads in the underlying action. The Supreme Court's decisions in *Hans v. Louisiana* and *Alden v. Maine* would require the dismissal of the state agencies as defendants if it were consistent with the text and history of the Eleventh Amendment. The Eleventh Amendment, however, imposes no limitations on the right of citizens of a state to sue their state on federal question grounds for equitable relief in federal court. In the

11

alternative, the Appellants argue that the district court erred in denying them leave to amend on the grounds that they declined an opportunity to amend their complaint and that amendment would be futile. The Appellants did not receive a fair opportunity to be fully apprised of the state agencies' ground for Eleventh Amendment dismissal and the futility of amendment depends on the Court's own independent resolution of the substantive issues in this appeal.

Second, Appellants We The Patriots USA, Inc. and CT Freedom Alliance, LLC argue that the district court erred in dismissing their claims for their failure to plead sufficient facts to establish associational standing. They submit that, although they did not specifically identify members of their organizations by name, they did plead enough facts supporting their claim of associational standing to plausibly invoke it under a favorable reading of the complaint.

The substantive issues are much weightier. First, the Appellants argue that the newly amended Conn. Gen. Stat. § 10-204a violates their right to freely exercise their religion under the First Amendment. They contend that the district court made several preliminary errors in its decision to apply rational basis scrutiny to their claims, including improperly applying *Employment Division v. Smith*'s "neutrality" and "general applicability" framework, ignoring controlling Supreme Court precedent that requires strict scrutiny for hybrid-rights claims under the First Amendment, and disregarding the text and history of the Free Exercise, which

12

requires the application of strict scrutiny. They further submit that Conn. Gen. Stat. § 10-204a cannot survive strict scrutiny because it is not narrowly tailored to further a compelling state interest.

Second, the Appellants contend that, in dismissing their medical freedom and privacy claims, the district court ignored controlling Supreme Court precedent in *Roe v. Wade* and *Planned Parenthood v. Casey*, which prohibit courts from using asserted public health interests as "plenary overrides" to fundamental constitutional rights. The district court's error caused it to summarily dismiss the Appellants' claims without subjecting Conn. Gen. Stat. § 10-204a to strict scrutiny as required by *Roe* and *Casey*.

Third, the district court improperly dismissed the Appellants' age discrimination claims under the Fourteenth Amendment's Equal Protection Clause through the erroneous application of rational basis scrutiny. Even though the Appellants demonstrated that Conn. Gen. Stat. § 10-204a imposes a substantial burden on their right to freely exercise their religion, the district court required them to establish their Free Exercise claims first to receive strict scrutiny on their age discrimination claim. The district court's decision directly contradicts the Supreme Court's decisions in *Williams v. Rhodes* and *Massachusetts Bd. of Ret. v. Murgia*, which only require the Appellants to demonstrate a substantial burden on their rights to free exercise to receive strict scrutiny on their age discrimination claim.

13

Fourth, the district court similarly dismissed the Appellants' childrearing claims under the Fourteenth Amendment on the grounds that they were required to establish their Free Exercise Clause claims first. Like its treatment of the Appellants' age discrimination claims, the district court's summary dismissal runs contrary to Supreme Court precedent in *Troxel v. Granville*, which establishes an independent fundamental constitutional right for parents to control the rearing of their children free from state interference.

Finally, the district court dismissed Appellant Elidrissi's Individuals with Disabilities Education Act (IDEA) claim on the grounds that she did not plead sufficient facts to establish that her son was disabled within the meaning of IDEA. The district court arrived at its conclusion on the basis of the undersigned's omission of a single word in the Appellants' complaint, and it improperly ignored multiple reasonable inferences that it should have drawn in Appellant Elidrissi's favor under the well-established motion to dismiss standard.

## **ARGUMENT**

## I. **The District Court Erred By Dismissing The Appellants' Claims Against The State Agency Defendants And Denying The Appellants Leave To Amend.**

### A. **Standard of review.**

The Court reviews a district court's dismissal of a plaintiff's claims for lack of subject matter jurisdiction under a mixed standard of review. Factual findings are

14

reviewed for clear error and legal conclusions are reviewed *de novo*. *Close v. New York*, 125 F.3d 31, 35 (2d Cir. 1997).

The Court ordinarily reviews a denial of leave to amend under the "abuse of discretion" standard, but, when a district court concludes that amendment is futile, it reviews the conclusion *de novo*. *Smith v. Hogan*, 794 F.3d 249, 253 (2d Cir. 2015).

**B. <u>The district court erred in dismissing the Appellants' claims against the state agency Appellees in Counts One through Four for lack of subject matter jurisdiction on Eleventh Amendment grounds.</u>**

The Supreme Court's interpretation of the Eleventh Amendment is a legal fiction that still occasionally stumbles even skilled lawyers today. In *Hans v. Louisiana*, 134 U.S. 1 (1890) and *Alden v. Maine*, 527 U.S. 706 (1999), the Supreme Court held that the Eleventh Amendment extends its protection of state sovereign immunity in federal court to lawsuits brought by its own citizens. Relying on these precedents, the district court dismissed the Appellants' claims against the Connecticut Office of Early Childhood Development, the Connecticut State Department of Education, and the Connecticut Department of Public Health (collectively, "the state agency Appellees") in counts one through four of their complaint.[2]

---

[2] There was no dispute before the trial court that Connecticut has waived its Eleventh Amendment immunity as to Individuals with Disabilities Education Act (IDEA) claims, which Appellant Elidrissi brough in Count Five of the complaint.

The plain language of the Eleventh Amendment,[3] however, contains nothing that bars citizens of a state from suing that state for equitable relief in federal court, which the Supreme Court recognized as recently as *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 69-70 (1996). As Justice Souter pointed out in his *Alden* dissent, state sovereign immunity was a product of common law, not the federal constitution. *Alden*, 527 U.S. at 764-794 (Souter, J, dissenting) (tracing the history of state sovereign immunity). The federal constitution creates no immunity for states against federal question actions brought by their own citizens.

Thus, even though it followed Supreme Court precedent, the district court erred in dismissing the Appellants' claims against the state agency Appellees.

## C. **The district court erred in denying the Appellants leave to amend on the grounds that they had declined an opportunity to amend their complaint and that amendment would be futile.**

Recognizing that they had made an error, the Appellants sought leave to amend their complaint to substitute the appropriate state officials for the state agency Appellees under *Ex Parte Young*, 209 U.S. 123 (1908). The district court denied their request for two reasons. First, it held that the Appellants had declined an opportunity to amend their complaint after the state agency Appellees identified their

---

[3] The plain language of the Eleventh Amendment reads: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, of by Citizens of Subjects of any Foreign State."

claim of Eleventh Amendment immunity at a pre-filing conference with the court. App.9, n.5. Second, it concluded that amendment would be futile because it was dismissing the entire action. App.9, n.5.

As a matter of practice, Judge Arterton typically holds a pre-filing conference with parties before they file a dispositive motion. At that conference, she typically requires the moving party to generally state the grounds on which it intends to file a dispositive motion, and she gives the non-moving party an opportunity to amend documents or take other steps as necessary. In this case, she held a pre-filing conference with the parties on June 30, 2021. App.146, Dkt. 20.

To the best of the undersigned's recollection, counsel for the state agency Appellees mentioned that they intended to move to dismiss on Eleventh Amendment grounds. During the state agency Appellees' explanation, Appellants' counsel incurred a momentary phone connection problem, but, to the best of their knowledge, the state agency Appellees did not elaborate on the basis for their Eleventh Amendment immunity argument. Without having any knowledge of the details of the argument, the undersigned did not foresee the necessity of amending their complaint because they mentally associated Eleventh Amendment immunity with damages claims, which the Appellants did not bring. Otherwise, they would have requested leave to amend.

17

Despite the undersigned's infirmities in that regard, amendment is still appropriate to ensure that justice is done in this case. *See* Fed. R. Civ. P. 15(a)(2) (a "court should freely give leave [to amend the complaint] when justice so requires"). The newly amended Conn. Gen. Stat. § 10-204a is a state statute that Connecticut has an undeniable interest in defending and enforcing. While the appellee boards of education undoubtedly would provide a capable defense of the statute, Connecticut will undoubtedly intervene to defend Conn. Gen. Stat. § 10-204a's constitutionality if the Court or the Supreme Court reverses the district court. Thus, permitting the Appellants to substitute the appropriate state officials would only facilitate what Connecticut will seek to achieve: ensuring a state defense of Conn. Gen. Stat. § 10-204a.

Additionally, as discussed below, the Appellants state claims upon which relief can be granted. If the Court reverses the district court's contrary determination, amendment would not be futile. Thus, the Appellants ask the Court to reverse the district court's refusal to allow them to amend their complaint to add the state officials under *Ex parte Young*.

18

**II.** **The District Court Erred By Dismissing The Appellants' – We The Patriots USA, Inc. and CT Freedom Alliance, LLC – Claims For Failing To Sufficiently Plead Associational Standing.**

    **A.** **Standard of review.**

A district court's dismissal of a plaintiff's claims for lack of standing is reviewed *de novo*. *Faculty v. New York University*, 11 F.4th 68, 74 (2021).

    **B.** **The district court erred in concluding that We The Patriots USA, Inc. and CT Freedom Alliance, LLC failed to properly plead associational standing because they did not allege specific members that were harmed by the newly amended Conn. Gen. Stat. § 10-204a.**

The party that invokes federal jurisdiction bears the burden of establishing Article III standing. *Faculty*, 11 F.4th at 74. An organization seeking to establish associational standing must show that (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests that it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 75. The Supreme Court requires organizational plaintiffs to identify members who have suffered the requisite harm. *Summers v. Earth Island Institute*, 555 U.S. 488, 499 (2009)

The sole issue at dispute in this case is whether We The Patriots USA, Inc. ("WTP") and CT Freedom Alliance, LLC ("CTFA") sufficiently identified members of its organization to successfully invoke associational standing. The district court relied on *Faculty* to hold that, even if the WTP and CTFA are not required to name

19

specific members, they failed to allege sufficient facts to identify their members. App.10-12. The district court, however, declined to infer certain connections from a natural reading of the complaint.

First, WTP pled that it had a significant number of members who were "Connecticut parents affected by the matters complained of herein." App.38, ¶ 2. CTFA pled that "most of its members" are "parents affected by the legislation complained of herein." App.38, ¶ 3. The matters that the complaint stated were alleged in specific detail. The newly amended Conn. Gen. Stat. § 10-204a required Connecticut "parents of children enrolled in preschool programs or any other prekindergarten program – public or private to vaccinate their children on or before September 1, 2022." App.40, ¶ 17. It did not require Connectict "parents of children already enrolled in kindergarten through grade 12 to vaccinate their children if vaccinating their children [was] contrary to their religious beliefs." App.40, ¶ 17.

These allegations clearly describe specific members of both organizations – Connecticut parents of pre-school and soon-to-be school children who have religious objections to taking vaccines and will be denied access to education for their children through the newly amended Conn. Gen. Stat. § 10-204a.

Additionally, WTP and CTFA spearheaded this litigation on behalf of their members – CTFA's general counsel even took the rare step of signing the complaint. App.51. It takes no stretch of logic to infer that the three individual Appellants –

20

Constantina Lora, Miriam Hidalgo, and Asma Elidrissi – are members of both organizations as their allegations are illustrative of WTP's and CTFA's members' plight.

Thus, WTP and CTFA have plausibly invoked associational standing, and the Court should reverse the district court's finding that they did not properly plead it.

## III. The District Court Erred By Dismissing The Appellants' Free Exercise Claims For Failure To State A Claim Upon Which Relief Can Be Granted.

### A. Standard of review.

A district court's dismissal of an action on grounds that the plaintiffs have failed to state a claim under Fed. R. Civ. P. 12(b)(6) is reviewed *de novo*, "accepting as true all facts alleged in the complaint and drawing all reasonable inferences in favor of the plaintiff[s]." *Phillips v. New York*, 775 F.3d 538, 542 (2d Cir. 2015).

### B. The district court erred in holding that Second Circuit precedent forecloses the Appellants' Free Exercise claim before conducting any evaluation of what scrutiny to use in its analysis of Conn. Gen. Stat. § 10-204a, as amended by Public Act No. 21-6.

The district court erred in holding that the Court's decision in *Phillips v. New York*, 775 F.3d 538 (2d Cir. 2015) foreclosed the Appellants' Free Exercise claim before it conducted any evaluation of what scrutiny to use in its analysis of Conn. Gen. Stat. § 10-204a, as amended by Public Act No. 21-6. App.13-17. In doing so, the district court committed two fundamental errors, including one which the Supreme Court has expressly cautioned courts against committing.

21

The district court's first error was to construe the Court's dicta in *Phillips* as a binding holding on whether school vaccination requirements that do not permit religious exemptions can categorically survive a Free Exercise analysis. App.17. As discussed below, the Court has never squarely considered that question, and it did not give it any sort of thorough analysis in *Phillips*.

The district court's second error was to ignore the Supreme Court's language in *Planned Parenthood v. Casey*, 505 U.S. 833 (1992), which rejected a "plenary override" of any individual liberty claims under the Constitution. App.13-17. As discussed below, the district court's error caused it to ignore a clear instruction from the Supreme Court and tainted the Free Exercise Clause analysis that it ultimately conducted.

1. ***Phillips* does not hold that school vaccination requirements that do not permit religious exemptions categorically survive any Free Exercise Clause analysis although it contains dicta to that effect.**

*Phillips*' facts and claims are fairly straightforward. At the time that its plaintiffs initiated the underlying lawsuit, New York required its public-school students to be immunized against various illnesses. *Phillips*, 775 F.3d at 540. It, however, permitted parents to claim medical and religious exemptions to the requirement, and it provided multiple layers of review if either form of exemption was denied. *Id*. at 540. Two of the *Phillips* plaintiffs challenged the exclusion of their unvaccinated children – both of whom had received religious exemptions –

22

from their schools when a single fellow student was diagnosed with chicken pox. *Id*. at 541. The third *Phillips* plaintiff challenged New York's denial of her request for a religious exemption on the grounds that she did not have genuine and sincere religious beliefs – a claim that she failed to properly preserve for appeal. *Id*. at 541, 543 n.6. The *Phillips* plaintiffs asserted claims for violations of their substantive due process rights, the First Amendment's Free Exercise Clause, the Fourteenth Amendment's Equal Protection Clause, the Ninth Amendment, and state and muncipal law. *Id*. at 540.

With respect to the Free Exercise Clause claim, the sole issue before the *Phillips* court was whether the exclusion of the first two plaintiffs' children from school during a possible chicken pox outbreak violated their religious liberty. The *Phillips* court recited the key points of *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), *Prince v. Massachusetts*, 321 U.S. 158 (1944), and *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) to hold that New York's limited exclusion of religiously exempt children from school was clearly constitutional. *Phillips*, 775 F.3d at 543.

The *Phillips* court, however, did not content itself with deciding the discreet issue in front of it. It categorically stated that mandatory vaccination for school admission "does not violate the Free Exercise Clause." *Id*. at 543. It also opined that "New York could constitutionally require that all children be vaccinated in order to

attend public school," but that it went "beyond what the Constitution requires by allowing an exemption for parents with genuine and sincere religious beliefs." *Id*. at 543.

These conclusions were not necessary to the *Phillips* court's decision of the case, and the *Phillips* court reached them without the thorough explanation indicative of a careful analysis of an incredibly important issue. Thus, they are mere dicta. *See* Hon. Pierre N. Leval, *Judging Under The Constituion: Dicta About Dicta*, 81 N.Y.U. L. Rev. 1249, 1256 (2006) ("If the court's judgment and the reasoning which supports it would remain unchanged, regardless of the proposition in question, the proposition play no role in explaining why the judgment goes for the winner. It is superfluous to the decision and is dictum"). To convert *Phillips*'s dicta into a binding holding would avoid giving careful deliberation to the constitutional question presented by this appeal insofar as it concerns public schools.

Additionally, *Phillips* is distinguishable from this appeal. *Phillips* considered a New York law that applied only to public schools, and its dicta only opined on public-school vaccination requirements. Conn. Gen. Stat. § 10-204a, as amended by Public Act No. 21-6, applies to both public and private schools, daycares, and colleges, thus leaving the faithful no options for obtaining an education for their children. The Connecticut statute's draconian nature goes far beyond anything that

24

even *Phillips*'s dicta envisioned, and it merits a careful independent analysis, which the district court failed to conduct since it was hampered by *Phillips*.

**2. The Supreme Court has instructed courts not to employ a public health "plenary override" for individual liberty claims under the federal constitution.**

The district court construed *Phillips* so broadly that it violated a clear holding from the Supreme Court. The Court should avoid taking a similar path that places *Phillips* in conflict with the Supreme Court's decision in *Planned Parenthood v. Casey*, 505 U.S. 833 (1992).

The *Casey* Court undertook a delicate task. In the years following the Supreme Court's decision in *Roe v. Wade*, 410 U.S. 113 (1973), significant confusion had arisen as to the meaning and scope of *Roe*'s holding. *Casey*, 505 U.S. at 845. Thus, *Casey* engaged in a systematic reevaluation of *Roe* as it reaffirmed it.

As part of that systematic reevaluation, the *Casey* Court attempted to trace *Roe*'s lineage, and it ultimately acknowledged that it stood "at an intersection of two lines of decisions…" – ultimately concluding that both lines of cases supported its ultimate holding. *Id*. at 857. The *Casey* Court described the second line of cases as standing for a clear rule:

> *Roe*, however, may be seen not only as an exemplar of *Griswold* liberty but as a rule (whether or not mistaken) of personal autonomy and bodily integrity, with doctrinal affinity to cases recognizing limits on governmental power to mandate medical treatment or to bar its rejection. If so, our cases since *Roe* accord with *Roe*'s view that a

25

> State's interest in the protection of life falls short of justifying any
> plenary override of individual liberty claims.

*Id.* at 857. Among the cases that the *Casey* Court cited as standing contrary to this proposition was *Jacobson v. Massachusetts*. *Id*. at 857.

The *Casey* Court's interpretation was clear. Even if a state claims an interest in protecting life and that interest is readily apparent, its interest in protecting life does not foreclose a careful constitutional analysis, which may ultimately conclude in the individual's favor as both *Roe* and *Casey* illustrate.

*Phillips* itself seems to recognize this principle as the Court paid passing homage to the "neutrality" and "general applicability" analyses required by *Hialeah*. *Phillips*, 775 F.3d at 543. Despite the lack of articulated analysis, the *Phillips* court appears to have at least considered its impact in deciding the case before it.

Additionally, in *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 280-290 (2d Cir. 2021), the Court conducted careful constitutional analyses instead of merely invoking *Phillips*, *Jacobson*, or *Prince* to reject the plaintiffs' request for a preliminary injunction based on Free Exercise claims. The thorough and careful nature of its analyses carry even more weight because, unlike *Phillips*, the Court was considering the constitutionality of emergency mandatory vaccination requirements for healthcare workers, and it still conducted careful analyses instead of invoking *Phillips* to summarily decide the case.

26

No such emergency exists in this case, but, as a precursor to conducting an analysis of the Appellants' Free Exercise Clause claims under First Amendment jurisprudence, the district court concluded that *Phillips* categorically bars their claims. App.17. Its conclusion fundamentally tainted its ultimate analysis of the Appellants' Free Exercise Clause claims because it had already predetermined the outcome of that analysis and it gave no independent consideration to the fact that Connecticut now leaves no educational options to those who object to vaccination on religious grounds.

The district court's overbroad invocation of *Phillips* constitutes reversible error, which the Appellants urge the Court to recognize and to conduct its own independent analysis of Conn. Gen. Stat. § 10-204a, as amended by Public Act No. 21-6.

**C. The district court erred in applying rational basis scrutiny to Conn. Gen. Stat. § 10-204a, as amended by Public Act No. 21-6.**

The Appellants' Free Exercise Clause claims turn, in large part, on the level of scrutiny applied to Conn. Gen. Stat. § 10-204a. The district court applied rational basis scrutiny, and it upheld Conn. Gen. Stat. § 10-204a's constitutionality. App.18-25. Its conclusion that rational basis scrutiny applies, however, is constitutionally erroneous for three reasons.

First, Conn. Gen. Stat. § 10-204a, as amended by Public Act No. 21-6, fails the "neutrality" and "general applicability" test established in *Employment Div.*

27

*Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990). Second, Conn. Gen. Stat. § 10-204 presents a hybrid-rights situation under *Smith*, requiring the application of strict scrutiny. Third, *Smith*'s "neutrality" and "general applicability" test deviates from the text and history of the First Amendment, which requires the application of strict scrutiny.

> **1. Conn. Gen. Stat. § 10-204a fails the "neutrality" and "general applicability" test established in *Smith*, thus triggering strict scrutiny.**

The district court erroneously concluded that the newly amended Conn. Gen. Stat. § 10-204a survives the "neutrality" and "general applicability" test established in *Smith*, thus allowing it to escape strict scrutiny. Its conclusion does not square with the Supreme Court's precedents.

At the outset, a law will not qualify as neutral if a religious exercise is the "object" of a law and not just "incidental[ly]" or unintentionally affected by it. *Smith*, 494 U.S. at 878. At a bare minimum, that means that a law may not "discriminate on its face." *Hialeah*, 508 U.S. at 533. It also means that a law will not qualify as neutral if it is "specifically directed at… [a] religious practice." *Smith*, 494 U.S. at 878.

Prior to April 28, 2021, Conn. Gen. Stat. § 10-204a permitted religious exemptions to Connecticut's school vaccination requirements. App.40, ¶¶ 14-18. Through Public Act No. 21-6, Connecticut specifically targeted religious practices

28

that it disagrees with – refusing to take a vaccine because of its ingredients – and it eliminated any tolerance for them whatsoever by completely foreclosing any opportunity for parents who hold religious beliefs against taking vaccines to educate their children at all.

Thus, even if Public Act No. 21-6's legislative history is free from expressions of animus, what it did speaks louder than words. The message that it sends is clear: Your children will not be educated if you do not conform your religious beliefs to the dictates of the state. Thus, in no way is the newly amended Conn. Gen. Stat. § 10-204a neutral.

The newly amended Conn. Gen. Stat. § 10-204a also fails *Smith*'s "general applicability" test. "A law is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton v. City of Philadelphia, Pennsylvania*, 141 S.Ct. 1868, 1877 (2021) (internal quotation marks and citations omitted). "A law also lacks general applicability if it permits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id*. at 1877. While it is true that all laws are somewhat selective, the Supreme Court has held that specific "categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice." *Hialeah*, 508 U.S. at 542.

29

With respect to the lack of general applicability as a categorical matter, at least one circuit court has previously held that the categorical granting of medical exemptions, but not religious exemptions, violates the neutrality and general applicability requirements of the Free Exercise Clause. In *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3rd Cir. 1999), the Third Circuit held that a police department's medical exemptions from a shaving policy, but categorical denial of religious exemptions, constituted a set of individualized exemptions within the meaning of *Lukumi*. Of particular concern to the Third Circuit was when "the government does not merely create a mechanism for individualized exemptions, but instead, actually creates a categorical exemption for individuals with a secular objection, but not for individuals with a religious objection." *Id*. at 365. Thus, it held that such a categorical distinction triggered strict scrutiny because the medical exemption undermined the government's interests in the same way that the religious exemption did. *Id*.

Concededly, the Court disagreed with the Third Circuit's view in *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 285 (2d Cir. 2021), specifically citing *Smith*'s finding that the criminalization of substance possession was generally applicable even though it contained an exception for medical purposes, but not religious ones. The emergent circumstances that required speedy consideration in *Hochul*, however, distracted the Court and counsel from *Hialeah*'s cautionary note:

"All laws are selective to some extent, but categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice." *Hialeah*, 508 U.S. at 542. *Hialeah* did not undertake to elaborate on the precise standard under which to evaluate whether a categorical prohibition fails the "general application" standard, but it clearly held that impermissible "inequality results when a legislature decides that the governmental interests that it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Id*. at 542-43.

Here, Connecticut has specifically acted against conduct with a religious motivation by amending Conn. Gen. Stat. § 10-204a to extend its mandate to religious conduct. It took that specific action a step further by crafting a law that would ensure the exclusion of the faithful from every possible form of education in Connecticut – all while scrupulously permitting a separate secular category of conduct that undermines its interests equally to stand untouched. This raises the very concern that *Hialeah* cautioned against, and it deprives Conn. Gen. Stat. § 10-204a of any vestige of general applicability.

The newly amended Conn. Gen. Stat. § 10-204a also fails a "general applicability" analysis because it creates a system of individualized exemptions that are guided by categorical "haves" and "have-nots." The medical exemptions that it permits must still be vetted and approved by state and local officials before they are

31

granted. In other words, state and local officials still possess individualized discretion under Conn. Gen. Stat. § 10-204a to grant or deny individualized exemptions from Conn. Gen. Stat. § 10-204a's vaccination mandate.

Under an individualized exemption scheme, whether two activities or exemptions are comparable for purposes of a Free Exercise Clause analysis is determined by the risks that they pose, not the reasons for giving them. *Tandon v. Newsom*, 141 S.Ct. 1294, 1296 (2021). When two unvaccinated children walk through the schoolhouse door, disease will not walk up to them and ask them why they are not unvaccinated before it infects them. In the Appellees' eyes, both unvaccinated children – regardless of whether they are unvaccinated for medical or religious reasons – are more likely to spread contagious disease than their vaccinated peers. The Appellees, however, conduct individualized assessments of how to give exemptions to with pre-ordained discriminatory outcomes that have no basis in science or law. Their individualized assessments – outcome predestined or not – render it impossible for Conn. Gen. Stat. § 10-204a to survive a "general applicability" analysis.

Thus, Supreme Court precedents require the application of strict scrutiny.

### 2. Conn. Gen. Stat. § 10-204a presents a hybrid-rights violation under *Smith*, requiring the application of strict scrutiny.

Candor requires the Appellants to inform the Court that a three-member panel of the Court has already rejected a hybrid-rights theory for Free Exercise Clause

claims that requires the application of strict scrutiny. *See Leebaert v. Harrington*, 332 F.3d 134 (2d Cir. 2003). They, however, submit that the Court's *Harrington* decision was erroneous in light of *Smith*'s reservation of a hybrid rights exception to its "neutral, generally applicable law" standard.

In justifying its decision to adopt the "neutral, generally applicable law" test to select which level of scrutiny to apply to Free Exercise claims, the *Smith* Court explored the Supreme Court's precedents at length and concluded that the only decisions in which it held that "a neutral, generally applicable law" unconstitutional on Free Exercise grounds were cases where Free Exercise claims were co-joined with "other constitutional protections, such as freedom of speech and of the press…." *Smith*, 494 U.S. at 881-82. It then cited a litany of cases in which it had invalidated laws under strict scrutiny or its equivalent to support the proposition that *Smith* was not overruling them. *Id*. at 881-82 (compiling cases).

In particular, the *Smith* Court drew attention to *Wisconsin v. Yoder*, 406 U.S. 205, 233-34 (1972) where it expressly recognized a form of heightened scrutiny for Free Exercise claims accompanied by other constitutional claims:

> *Yoder* said that "the Court's holding in *Pierce* stands as a charter of the rights of parents to direct the religious upbringing of their children. And, when the interests of parenthood are combined with a free exercise claim of the nature revealed by this record, more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's requirement under the First Amendment."

*Id.* at 881 n.1. In other words, *Smith* reserves *Yoder*'s application of heightened scrutiny for hybrid rights claims.

*Leebaert*'s attempt to distinguish *Yoder* places this Court in a precarious situation. *Leebaert* held that the *Yoder* Court explicitly limited its holding to "a free exercise claim of the nature revealed by this record." *Leebaert*, 332 F.3d at 145 (quoting *Yoder*, 406 U.S. at 233). This strained interpretation ignores *Smith*'s natural interpretation and places the Court in the awkward position of affording special treatment to a particular religious sect, which would raise significant Establishment Clause, Free Exercise Clause, equal protection, and due process concerns.

The natural reading of *Yoder* is the one implied by *Smith*. The traditional Amish plaintiffs in *Yoder* created a compelling record for why Wisconsin's compulsory school attendance law would change their traditional way of life, which was deeply rooted in their sincere religious beliefs. The *Yoder* Court respectfully recognized the persuasiveness of the impressive record that they had assembled as to the sincerity of their faith, commenting that few religious sects could have assembled such a record. Contrary to *Leebaert*'s interpretation, however, it uttered no language that purported to limit the hybrid rights standard to religious sects that could assemble equally impressive records as to the sincerity of their religious beliefs.

To limit *Yoder* to similar records as the *Yoder* record would be tantamount to the Court saying that it does not believe that anyone could be as sincere in their religious beliefs as the Amish plaintiffs in *Yoder* were. In other words, *Leebaert* interprets *Yoder* as a special exception for plaintiffs who can show institutionalized religious traditions spanning centuries while denying the same First Amendment protection to plaintiffs who are equally sincere in their religious beliefs but lack centuries-old institutionalized religious traditions.

Such an interpretation is inconsistent with the Supreme Court's Establishment Clause decisions and creates disparate treatment under the law. In *United States v. Seeger*, 380 U.S. 163, 184 (1965), the Supreme Court established an objective test for the sincerity of a person's religious beliefs: "[D]oes the claimed belief occupy the same place in the life of the objector as an orthodox belief in God holds in the life or one clearly qualified for exemption?" *See also Davis v. Beason*, 133 U.S. 333, 342 (1890) ("[T]he term 'religion' has reference to one's views of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to his will"). The Supreme Court also clearly established that this test was individualistic in nature:

> The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion.

35

*Everson v. Board of Education*, 330 U.S. 1, 15 (1947).

Interpreting *Yoder* as being confined to cases with a similarly impressive record to the one assembled by the traditional Amish would be inconsistent with these precedents. *Smith* clearly does not confine *Yoder* to its facts, and it clearly indicates that it did not overrule *Yoder*'s hybrid-rights selection of heightened scrutiny. *Leebaert*'s leap to do so contradicts both *Smith* and *Yoder*.

The Court should avoid committing the same error here. The Appellants have asserted claims that Conn. Gen. Stat. s 10-204a, as amended by Public Act 21-6, violates their right to freely exercise their religion and their right to direct the education and rearing of their children – *see Troxel v. Granville*, 530 U.S. 57, 65-66 (2000); *Pierce v. Sco'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925). The combination of those claims is sufficient to trigger strict scrutiny under *Yoder* and *Smith*, which the district court declined to apply as it is bound to follow *Leebaert*. Thus, the Appellants ask the Court to overrule *Leebaert* and apply strict scrutiny under the hybrid rights exception to *Smith*.

**3. *Smith*'s "neutrality" and "general applicability" test deviates from the text of the First Amendment, which requires the application of strict scrutiny.**

At the outset, candor requires the Appellants to inform the Court that the Supreme Court has not yet overruled *Smith*, recently passing on the chance to do so in *Fulton v. City of Philadelphia, Pennsylvania*, 141 S.Ct. 1868 (2021) despite

36

granting certiorari to consider that question. They also recognize that the Court must adhere to the Supreme Court's precedent, but they present this argument to the Court to preserve it for Supreme Court review.

Compelling constitutional reasons exist to return the First Amendment's Free Exercise Clause to its original meaning. At the outset, *Smith* does not rely on the text, history, or tradition of the First Amendment's Free Exercise Clause, but rather on several predictions about the outcome of the rule that it fashioned out of thin air. The predictions included speculation that a multitude of religious exemptions would court anarchy – *Smith*, 494 U.S. at 888 – and that state legislatures would be sufficiently "solicitous" of the need for religious exemptions – *id*. at 890.

These alternating predictions have proven woefully inaccurate. First, RFRA has eliminated *Smith*'s federal impact for the past 28 years, and RLUIPA has also contributed to *Smith*'s negligble federal impact for the past 20 years. The Supreme Court itself recognized that the federal judiciary is "up to the task" of determining when laws should trump free exercise rights. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006); *see also* Luke W. Goodrich & Rachel N. Busick, *Sex, Drugs, and Eagle Feathers: An Empirical Study of Federal Religious Freedom Cases*, 48 Seton Hall L. Rev. 353 (2018) (assessing the number of federal RFRA and RLUIPA cases as comprising a relatively small portion of the federal caseload). In other words, *Smith*'s predictions of anarchy have proven to be

unfounded. This case is equally unlikely to yield mobs of religious fanatics running amok in Foley Square.

Second, legislatures have proven incredibly unsolicitous of religious rights. This case is Exhibit A, but the Court need not confine itself just to this case. In the 30 years since the Supreme Court decided *Smith*, the Supreme Court has confronted case after case that has imposed hostile restrictions on religious freedom. *See, e.g., Fulton*, 141 S.Ct. 1868; *Masterpiece Cake, Ltd. V. Colorado Civil Rights Comm'n*, 138 S.Ct. 1719 (2018); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012 (2017); *Holt v. Hobbs*, 574 U.S. 352 (2015); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). In other words, legislatures and governments have been anything but solicitous of religious freedoms.

The result is that *Smith* has reduced the First Amendment's Free Exercise Clause to a watered-down Equal Protection Clause that falls far short of safeguarding the affirmative right for believers to *practice* their religion free from government interference. The Founders envisioned strong affirmative protections for religious liberty when crafting the First Amendment, not an equal protection regime. *See* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1471-72 & n.320 (1990) (describing the effect of William Penn's hat and its effect on the debate over the First Amendment). The First Amendment's text clearly indicates the Founders' vision.

The Free Exercise Clause bars states from making any law "prohibiting the free exercise of religion." Interpreted according to its "normal and ordinary… meaning" per *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Free Exercise Clause prohibits laws "forbidding or hindering unrestrained religious practices or worship." *Fulton*, 141 S.Ct. at 1896 (Alito, J., concurring) (sourcing the original "normal and ordinary" meaning of the Free Exercise Clause's text). This language grants those who wish to engage in the "exercise of religion" the right to do so without hindrance, and it does not condition that right on the treatment of others who are not exercising religion like *Smith* claims that it does.

Congress's intent to create an affirmative guarantee instead of a prohibition on non-discrimination becomes clear when considering constitutional language that does contain non-discrimination language. For instance, Art. I, § 9, cl. 6, provides that "[n]o Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another." Under Art. IV, § 2, cl. 1, "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." In other words, had Congress desired to create a *Smith*-style Free Exercise Clause, it had clear textual examples to model the Free Exercise Clause on. It deliberately chose not to adopt *Smith*'s non-discrimination approach.

Thus, the Free Exercise Clause requires the application of the standard that *Smith* replaced in this case: A law imposing a substantial burden on religious

39

exercise can only survive scrutiny if it is narrowly tailored to serve a compelling government interest. *See Sherbert v. Verner*, 374 U.S. 398 (1963).

### D. Conn. Gen. Stat. § 10-204a, as amended by Public Act No. 21-6, cannot survive strict scrutiny.

Under a strict scrutiny analysis, a government defendant must show that the challenged law is narrowly tailored to further a compelling government interest. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 172 (2015). The Appellees cannot meet the narrow tailoring element.[4]

The newly amended Conn. Gen. Stat. § 10-204a is anything but narrowly tailored. It prohibits a child from attending public or private schools, daycares, and pre-schools unless that child receives the vaccinations required by the state of Connecticut. If the Appellees choose to enforce the provisions against parents who homeschool and report to their local school boards, the parents of a child who objects to taking a vaccine on religious grounds will be forced to choose between educating their children or abandoning their religious beliefs.

The sheer harshness of how far the Appellees have gone here cannot be overstated, and they had many ways by which they could have more narrowly tailored their "solution." The Appellees articulated a concern that parents were

---

[4] The Appellants initially contested both elements, but they conceded at oral argument before the district court that Connecticut has a compelling interest in protecting the public health of the community. App.25.

exploiting religious exemptions for improper purposes. They could have easily redressed that concern by reforming the religious exemption process to require parents to complete sworn statements explaining their religious beliefs and requiring them to view a presentation on the importance of taking vaccinations and common misconceptions about them. They could have still afforded the Appellants and similarly situated parents the ability to send their children to private schools, pre-schools, and daycares without being forced to choose between their faith and their children's futures, thus mitigating a substantial portion of the problem that the Appellees perceive in public schools.

If the Appellees' concern is that too many exemptions to vaccination requirements pose a danger to public health, it could have articulated a threshhold percentage of vaccinated students needed to achieve herd immunity and divided exemptions to its vaccination requirement in a non-discriminatory manner between medical and religious objectors. It chose not to do that.

Instead of selecting these reasonable alternatives, which would have struck a middle ground, the Appellees made it impossible for the Appellants to obtain educations for their children while adhering to their religious beliefs. The Appellees' selection of the most draconian means to further their interests dooms the newly amended Conn. Gen. Stat. § 10-204a in a strict scrutiny analysis. Thus, the

Appellants ask the Court to reverse the district court's grant of the Appellees' motions to dismiss their Free Exercise Clause claims.

## IV. The District Court Erred By Dismissing The Appellants' Medical Freedom And Privacy Claims For Failure To State A Claim Upon Which Relief Can Be Granted.

### A. Standard of review.

A district court's dismissal of an action on grounds that the plaintiffs have failed to state a claim under Fed. R. Civ. P. 12(b)(6) is reviewed *de novo*, "accepting as true all facts alleged in the complaint and drawing all reasonable inferences in favor of the plaintiff[s]." *Phillips v. New York*, 775 F.3d 538, 542 (2d Cir. 2015).

### B. The district court erroneously concluded that the Fourteenth Amendment does not establish a right to medical freedom and privacy that can overcome a state's interest in mandatory vaccinations.

At the outset, the Appellants acknowledge that the Court has already held in *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 293 (2d Cir. 2021) that the constitution does not contain a fundamental right that would render vaccine requirements imposed in a public health emergency unconstitutional. They further recognize that the Court also held in *Phillips v. City of New York*, 775 F.3d 538, 542-43 (2d Cir. 2015) that there are no freestanding substantive due process rights under the Fourteenth Amendment that prohibit the state from mandating vaccination as a condition of school attendance. The district court relied on these cases, but these

42

cases are distinguishable. Thus, the district court's reliance on them to dismiss Count Two of the Appellants' complaint was erroneous.

At the outset, the Court decided *Hochul* in a fundamentally different procedural context. The *Hochul* plaintiffs applied for a preliminary injunction, which required the Court to make an overall assessment of the merits of their case. *Hochul*, 17 F.4th at 273-74 ("We stress that we do not now decide the ultimate merits of Plaintiffs' legal claims or of the State's defenses…). While the Court did make strong statements as to the *Hochul* plaintiffs' Fourteenth Amendment claims, it did not conclusively decide them.

Additionally, *Hochul* concerned a far different context. The *Hochul* plaintiffs challenged a New York regulation that ostensibly addressed a public health emergency. The Appellants challenge a far broader law that excludes their children from any educational opportunities because of their vaccination status.

*Phillips* also is distinguishable. The *Phillips* plaintiffs did not appear to plead any form of fundamental unenumerated right, and they only advanced an untethered substantive due process claim under the Fourteenth Amendment – precisely the same sort of generalized liberty claim that the Supreme Court rejected in *Jacobson*. *Phillips*, 775 F.3d at 542-43. Here, the Appellants have located applicable fundamental constitutional rights, and the district court gave them short shrift in reliance on *Hochul* and *Phillips*. To do so was error.

43

The Supreme Court unequivocally established a fundamental right to privacy under the Fourteenth Amendment in *Roe v. Wade* and prior decisions. *See Roe v. Wade*, 410 U.S. 113, 152-53 (1973). While its precedents only covered matters pertaining to marriage, procreation, contraception, family relationships, and child rearing and education, the *Roe* Court refrained from confining it to just those areas. *Id*. at 152-53. The *Roe* Court then elaborated on the medical nature of the decision that a woman must make on whether to elect an abortion:

> This right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, as we feel it is, or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy. The detriment that the State would impose upon the pregnant woman by denying this choice altogether is apparent. Specific and direct harm medically diagnosable even in early pregnancy may be involved. Maternity, or additional offspring, may force upon the woman a distressful life and future. Psychological harm may be imminent. Mental and physical health may be taxed by child care. There is also the distress, for all concerned, associated with the unwanted child, and there is the problem of bringing a child into a family already unable, psychologically and otherwise, to care for it. In other cases, as in this one, the additional difficulties and continuing stigma of unwed motherhood may be involved. All these are factors the woman and her responsible physician necessarily will consider in consultation.

*Id*. at 153.

The Supreme Court then reaffirmed its decision in *Planned Parenthood v. Casey*, 505 U.S. 833 (1992) and describe the choice on whether to get an abortion as one of the "most intimate and personal choices that a person may make in a lifetime,

choices central to personal dignity and autonomy." *Id*. at 851. Although the *Casey* Court located the right to an abortion under a Fourteenth Amendment liberty theory, it did not cast doubt on *Roe*'s formulation of the right as a right to privacy. *Id*. at 852-853.

Under these decisions, the decision to terminate a pregnancy is inherently a private medical decision. While the *Roe* Court cited *Jacobson* for the proposition that the fundamental right to privacy did not completely remove conduct from state regulation, it held that states could only regulate the right when its interest became compelling and its regulations must be narrowly tailored. *Roe*, 410 U.S. at 154-56. In other words, *Roe* required state regulations to survive strict scrutiny.

*Casey* balanced this equation. As discussed above, it clarified that neither *Jacobson* nor *Roe* functioned as a "plenary override" to each other – a proposition that was clearly of concern to the Court in *Hochul*, 17 F.4th at 293 n.35. *Casey*, 505 U.S. at 857. Thus, while *Jacobson* and *Phillips* may provide guidance as to the ultimate outcome, they cannot function as plenary overrides to regular constitutional analyses.

If the right to elect a medical procedure to terminate the life of another being is a fundamental constitutional right, the right to decline a vaccination on behalf of one's children is also a fundamental constitutional right with similar roots in the Supreme Court's child-rearing precedents such as *Pierce v. Sco'y of the Sisters of*

*the Holy Names of Jesus & Mary,* 268 U.S. 510, 535 (1925). *See also Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990) (holding that there is a fundamental constitutional right to refuse medical treatment). Like the right to abortion, the right to decline a vaccination is not an unlimited right, but one that is entitled to be protected by strict scrutiny. Thus, the district court erred in failing to apply strict scrutiny.

As discussed previously, the newly amended Conn. Gen. Stat. § 10-204a cannot survive strict scrutiny because there are ways where the Appellees can tailor their "solutions" for preventing the spread of contagious diseases to respect the Appellants' rights while being equally effective. These solutions include still allowing the Appellants to send their children to private schools, pre-schools, and daycares that may be more tolerant of their privacy rights. Thus, the district court erred in granting the Appellees' motion to dismiss.

**V. The District Court Erred By Dismissing The Appellants' Equal Protection Claims For Failure To State A Claim Upon Which Relief Can Be Granted.**

**A. Standard of review.**

A district court's dismissal of an action on grounds that the plaintiffs have failed to state a claim under Fed. R. Civ. P. 12(b)(6) is reviewed *de novo*, "accepting as true all facts alleged in the complaint and drawing all reasonable inferences in favor of the plaintiff[s]." *Phillips v. New York*, 775 F.3d 538, 542 (2d Cir. 2015).

46

**B. The district court erred by requiring the Appellants to successfully demonstrate a Free Exercise claim before strict scrutiny could be applied to their Equal Protection claim of age discrimination.**

The district court declined to apply strict scrutiny to Conn. Gen. Stat. § 10-204a in deciding the Appellants' claim that it discriminates on the basis of age in violation of the Fourteenth Amendment's Equal Protection Clause because it held that the Appellants were required to demonstrate a proper Free Exercise Clause claim as a prerequisite to receiving strict scrutiny. App.27-28. Its holding has no foundation in Supreme Court or Second Circuit precedent.

Age is not a suspect classification on its own for Fourteenth Amendment Equal Protection Clause claims, thus allowing courts to review standalone age discrimination claims under rational basis scrutiny. *Gregory v. Ashcroft*, 501 U.S. 452, 470 (1990). When a state's age-based classification burdens the exercise of a fundamental right, however, the Fourteenth Amendment requires courts to employ strict scrutiny to decide age-based discrimination claims. *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 312-313 (1976).

The Supreme Court has already recognized that the free speech and freedom of association rights guaranteed by the First Amendment are fundamental for purposes of an Equal Protection Clause analysis. *Williams v. Rhodes*, 393 U.S. 23, 30-34 (1968); *see also Murgia*, 427 U.S. at 312 n.3. Supreme Court precedents firmly establish that the freedom to exercise one's religion is a fundamental constitutional

47

right. *See Cantwell v. State of Connecticut*, 310 U.S. 296, 307 (1940) ("The fundamental law declares the interest of the United States that the free exercise of religion be not prohibited…"); *Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972) (same). Thus, if Conn. Gen. Stat. § 10-204a substantially burdens the Appellants' First Amendment rights to freely exercise their religion based on an age-based classification, the Supreme Court's precedents require courts to review the Appellants' Equal Protection claims under strict scrutiny.

Contrary to the district court's view, these cases do not require plaintiffs to state plausible First Amendment claims as a prerequisite to receiving strict scrutiny on their Equal Protection claims. Instead, they require plaintiffs to demonstrate a burden on a fundamental constitutional right – a far different hurdle to overcome than pleading a claim through *Smith*'s "neutrality" and "general applicability" standard. *Rhodes*, 393 U.S. at 30-31.

*Rhodes* is particularly instructive in this regard. In *Rhodes*, the Ohio American Independent Party and the Socialist Labor Party brought equal protection challenges to an Ohio election law that required new political parties to obtain petitions signed by voters totaling 15% or more of the total ballots cast in the last gubernatorial election as well as other laws that made it impossible for any political party except the Republican and Democratic parties to get on the ballot. *Id*. at 24-26. The parties only brought equal protection claims. *Id*. at 26.

48

In its analysis, the Supreme Court devoted no time or analysis to discussing whether the parties could have stated claims for freedom of association or the right to vote, and it did not slam the courthouse door because the parties failed to bring those claims. *Id*. at 30-31. Instead, the Supreme Court focused on analyzing the unequal burdens placed on the rights of the Ohio American Independent Party and the Socialist Labor Party. *Id*. at 31. It found the burdens on their fundamental constitutional rights to be substantial enough to require strict scrutiny. *Id*. at 31.

In other words, the *Rhodes* analysis is not whether the Appellants can state a Free Exercise claim, but rather whether Conn. Gen. Stat. § 10-204a creates an unequal burden on their free exercise of their religion in a discriminatory fashion. The district court cites no controlling appellate authority to contradict *Rhodes*, and it failed to address *Rhodes* at all in its decision, thus breaking from Supreme Court precedent in this case.

It is undisputed that Conn. Gen. Stat. § 10-204a does not merely substantially burden the Appellants' rights to freely exercise their religion. It completely prohibits them from freely exercising their religion and educating their children or obtaining daycare for them. Conn. Gen. Stat. § 10-204a purports to protect public health by requiring children in public and private schools, daycares, and preschools to receive certain vaccinations despite their religious beliefs. App.40, ¶ 17. In other words, Conn. Gen. Stat. § 10-204a forces the Appellants to choose between adhering to their

religious convictions and securing their children's future by providing them with the education necessary to be contributing members of society because they cannot even turn to private institutions – let alone public ones – without discarding their religious beliefs.

It, however, exempts children who are already enrolled in kindergarten through grade 12, creating an age-based classification between parents and children who are permitted to exercise their religious beliefs freely and parents and children who are not. App.40, ¶ 17. These children are mere months older than the Appellants' children. In other words, Conn. Gen. Stat. § 10-204a is a law that functionally says ""if you were old enough at the time of this act becoming law, we will respect your religion. If not, too bad. Your religious convictions do not matter."

The substantial burden to the Appellants' religious beliefs cannot be overstated. Conn. Gen. Stat. § 10-204a inevitably will create a class of second-class citizens on the basis of their religious convictions. The Appellants will face impossible odds to educate their children if they do not abandon their religious beliefs, and the consequences will devastate their children's futures by diminishing or completely depriving them of opportunities to attend college, obtain white-collar jobs, or be competitive for more career-driven blue-collar jobs. Their children will also face additional difficulties in exercising their rights to vote, serve on juries, and participate in the basic functions of a self-governing society. In other words, the

burden that Conn. Gen. Stat. § 10-204a imposes on children who exercise their religious beliefs will have devastating and lifelong consequences.

Thus, strict scrutiny does apply to Conn. Gen. Stat. § 10-204a's age discrimination, and Conn. Gen. Stat. § 10-204a cannot survive it. The Appellees lack a compelling interest to discriminate against the Appellants on the combined bases of age and religion, and they have practically conceded their lack of a compelling interest by the age-based classification that they drew. If the Appellees' interest truly lies in effectively guarding against a danger to public health posed by religious objections to vaccinations,[5] the Appellees would have mandated that all children currently attending kindergarten through grade 12 be vaccinated despite their religious exemptions. The Appellees failed to create that mandate in Conn. Gen. Stat. § 10-204a. Instead, they allowed all children currently attending kindergarten through grade 12 with a religious exemption to keep their exemptions. In other words, every child currently enrolled in kindergarten through grade 12 with a religious exemption poses the same "danger" that the Appellants' children supposedly do, and they will continue to pose that "danger" for another decade.

No compelling interest exists to justify allowing one class of children and their parents to freely exercise their religious beliefs and denying another class of children

---

[5] The Appellants do not concede that the Appellees' interest in protecting public health outweighs their First Amendment right to freely exercise their religion under any circumstances.

and their parents the right to freely exercise their religious beliefs because the children are too young. Thus, Conn. Gen. Stat. § 10-204a perpetuates invidious discrimination that is just as unconstitutional as other forms of discrimination – e.g., race-based discrimination – that American courts have declared unconstitutional and abhorrent.

Even assuming *arguendo* that the Appellees can assert some sort of compelling state interest, the Appellees have made no effort to narrowly tailor Conn. Gen. Stat. § 10-204a to lessen the impact of invidious age discrimination. They have completely foreclosed any avenue for the Appellants to obtain private daycare, pre-school, and primary and secondary education without waiving their religious beliefs. Conn. Gen. Stat. § 10-204a makes no provision for private or public schools to offer remote learning on a permanent basis to parents and children who assert a religious objection to taking vaccines. It makes no provision for private or public schools to offer separate, but equal facilities for parents and children who will not betray their faith by taking a vaccine.[6] In other words, viable alternatives exist that would allow the Appellees to fulfill their public health interests while permitting the Appellants to enjoy the constitutional freedom that birthed the United States – the freedom to

---

[6] If the Appellees struck this "yellow Star of David" course, the Supreme Court's decision in *Brown v. Board of Educ.*, 347 U.S. 483 (1954) would likely require the Court to declare it unconstitutional. The Appellants, however, would rather incur the invidious discrimination created by *Plessy v. Ferguson*'s "separate but equal" doctrine rather than betray their faiths. 163 U.S. 537 (1896).

exercise their religion – which even the Appellees dared not touch for those children who are old enough to claim it. The Appellees, however, have completely disregarded these alternatives and have adopted a law that presents parents with an appalling choice: abandon their religious beliefs or watch their children be completely marginalized in society. Thus, under no circumstances, can Conn. Gen. Stat. § 10-204a be said to have been narrowly tailored to meet a compelling state interest, and it fails strict scrutiny.

The district court avoided this analysis. The Appellants urge the Court to reverse it, faithfully apply the Supreme Court's precedent in *Rhodes*, and conduct a strict scrutiny analysis, which concludes in their favor as discussed above.

## VI. **The District Court Erred By Dismissing The Appellants' Childrearing Claims For Failure To State A Claim Upon Which Relief Can Be Granted.**

### A. **Standard of review**.

A district court's dismissal of an action on grounds that the plaintiffs have failed to state a claim under Fed. R. Civ. P. 12(b)(6) is reviewed *de novo*, "accepting as true all facts alleged in the complaint and drawing all reasonable inferences in favor of the plaintiff[s]." *Phillips v. New York*, 775 F.3d 538, 542 (2d Cir. 2015).

B. **The district court erred in holding that the Appellants' childrearing claim failed because it was contingent on the vitality of their Free Exercise claim.**

The district court erroneously relied on the Court's decision in *Leebaert* to conclude that the Appellants' claim of a Fourteenth Amendment right to childrearing was contingent on the survival of their Free Exercise claim. App.30. Its conclusion deviates grossly from Supreme Court precedent, which recognizes a separate and distinct Fourteenth Amendment right to childrearing.

The Supreme Court left no doubt on whether the right of parents to direct their children was a fundamental constitutional right in *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000): "The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." This principle even finds itself in one of the decisions that the Appellees chiefly relied on before the district court: ""It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince v. Massachusetts,* 321 U.S. 158, 166 (1944).

The Appellees have sounded alarm bells that these precedents do not give parents the right to expose their children to harm, implying that the Appellants are seeking to cause such harm to their children. Supreme Court precedent cautions the

opposite: "[T]he child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925) (striking down an Oregon law that compelled public school attendance). Responsibility and supreme authority for a child's well-being lies with that child's parents, and the Appellees may not supersede the Appellants' beliefs on how to raise their children in the name of protecting the child without a far more compelling and narrowly tailored reason than it advances in this case. *See Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972) (upholding the right of the Amish to withdraw their children from school after the eighth grade).

These precedents clearly establish that the Appellant possess a fundamental right to control and otherwise direct the upbringing of their children, including opting to decline a medical treatment that violates their faith. Thus, any state regulation of such a right, including the newly amended Conn. Gen. Stat. § 10-204a, must survive strict scrutiny to be declared constitutional.

Conn. Gen. Stat. § 10-204a cannot survive strict scrutiny here for the reasons previously discussed, and the Appellants ask the Court to reverse the district court's decision to dismiss Count Four of their complaint.

**VII. The District Court Erred By Dismissing Appellant Elidrissi's IDEA Claim For Failure To State A Claim Upon Which Relief Can Be Granted.**

**A. Standard of review.**

A district court's dismissal of an action on grounds that the plaintiffs have failed to state a claim under Fed. R. Civ. P. 12(b)(6) is reviewed *de novo*, "accepting as true all facts alleged in the complaint and drawing all reasonable inferences in favor of the plaintiff[s]." *Phillips v. New York*, 775 F.3d 538, 542 (2d Cir. 2015).

**B. The district court failed to draw all reasonable inferences in Appellant Elidrissi's favor.**

The district court dismissed Appellant Elidrissi's claim under the Individuals with Disabilities Education Act (IDEA) on the grounds that she did not sufficiently allege her son's disability for IDEA's purposes. App.31-32. The district court's conclusion, however, fails to draw all reasonable inferences in Appellant Elidrissi's favor.[7]

Fed. R. Civ. P. 8 only required Appellant Elidrissi to make short and plain statements of her factual allegations – sufficient to put the Appellees on notice of her claims. She more than complied with that standard.

The IDEA defines a "child with a disability" as a child who has "speech or language impairments" or "specific learning disabilities; and who by reason thereof,

---

[7] The state agency Appellees and the Appellee Stamford Board of Education also moved to dismiss Appellant Elidrissi's claim on the ground that the IDEA does not preempt Conn. Gen. Stat. § 10-204a. The district court did not address this question.

need special education and related services." 20 U.S.C. § 1401(3)(A)((i)-(ii)). 38 C.F.R. 300.8(a)(1) defines speech or language impairments as a "communication disorder, such as stuttering, impaired articulation, a language impairment, or voice impairment, that adversely affects a child's education performance."

Appellant Elidrissi pled that her son incurred a vaccine injury as the result of a measles, mumps, and rubella (MMR) vaccination. App.44, ¶ 40. He developed a speech and learning disorder for which he now receives "special services." App.44, ¶ 40. She further pled that her son was disabled within the meaning of the IDEA. App.49, ¶ 71.

A fair reading of Appellant Elidrissi's complaint demonstrates that her son has a speech and learning disorder that renders him disabled within the meaning of the IDEA and that he receives special educational services for his disability. This reading is eminently reasonable, especially in the context of a complaint about access to education in Connecticut. Instead of conducting this fair reading, the district court appears to have found the wording "special services" insufficient and concluded that Appellant Elidrissi needed to use the specific term "special education" to properly plead her complaint. Thus, the district court's reading actually draws inferences against Appellant Elidrissi despite there being far more reasonable inferences to draw in her favor.

The district court erred in that regard. Appellant Elidrissi's complaint – read in the light most favorable to her – indicates that her son receives special educational services, thus rendering it sufficiently pled to survive a motion to dismiss. Thus, Appellant Elidrissi asks the Court to reverse the district court's dismissal of her IDEA claim.

## **<u>CONCLUSION</u>**

Together, religion and education are the backbone of America. The former sustains its citizens and shapes future upstanding citizens into morally responsible contributors to society who embody the virtues that the nation prizes. The latter prepares them for self-government and the advancement of the greatest nation on earth. The latter cannot exist without a moral foundation, and the former cannot survive without latter. The Appellees have engaged in a brazen effort to force the Appellants to choose between their moral foundations and their children's futures. That effort violates the very fabric of freedom on which America stands. Thus, for all of the reasons stated herein, the Appellants respectfully ask the Court to reverse the district court's decision granting the Appellees' motions to dismiss in their entirety.

Dated: April 15, 2022                    Respectfully Submitted,


                                         /s/ Norman A. Pattis /s/
                                         /s/ Cameron L. Atkinson /s/
                                         Norman A. Pattis, Esq.
                                         Cameron L. Atkinson, Esq.
                                         PATTIS & SMITH, LLC
                                         383 Orange Street, 1st Fl.
                                         New Haven, CT 06511
                                         T: (203) 393-3017
                                         F: (203) 393-9745
                                         npattis@pattisandsmith.com
                                         catkinson@pattisandsmith.com


            *Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1. This brief complies with the type-volume limitation of Local R. 32.1 because it contain 13,542 words, excluding the parts of the brief exempted by Fed. R. App. P. 32, as determined by the word counting feature of Microsoft Word 2016.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32 and the typestyle requirements of Fed. R. App. P. 32 because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

Dated: April 15, 2022

/s/ Cameron L. Atkinson /s/
Cameron L. Atkinson

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on April 15, 2022, an electronic copy of the foregoing Brief Of The Plaintiffs-Appellants was filed with the Clerk of the Court using the ECF system and thereby served upon all counsel appearing in this case.

<u>/s/ Cameron L. Atkinson /s/</u>
Cameron L. Atkinson

61