JOSEPH F. BIANCO, *Circuit Judge*, concurring in part and dissenting in part:

I agree with the majority opinion as to all claims, except for its affirmance of the district court's dismissal of plaintiffs' claim challenging Public Act 21-6 (the "Act") under the Free Exercise Clause. I respectfully part company with the majority opinion as to Section I Parts B(2)(b) and B(3) where the majority concludes, *at the motion to dismiss stage*, that the Act passes constitutional muster under rational basis review pursuant to the legal standard articulated by the Supreme Court in *Emp. Div., Dep't of Hum. Res. of Ore. v. Smith*, 494 U.S. 872, 879 (1990).

I emphasize, as a preliminary matter, that this case is not about a state's general authority to enact a mandatory vaccination law for schoolchildren. The Supreme Court and this Court have made clear, and with good reason, that it is within a state's police powers to establish such a requirement. *See Zucht v. King*, 260 U.S. 174, 176 (1922) ("[I]t is within the police power of a state to provide for compulsory vaccination." (citing *Jacobson v. Massachusetts*, 197 U.S. 11 (1905)); *accord Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015) (per curiam). Instead, today, we address a narrower question: whether a mandatory vaccination requirement, which repeals its previously existing religious exemption and allows

1

*some* unvaccinated students—those with medical exemptions—to join their peers in schools, but excludes students who are unvaccinated due to religious objections, raises a plausible free exercise claim that survives a motion to dismiss. On this narrower question, the district court erred in concluding that plaintiffs' free exercise claim is foreclosed by our prior precedent. Indeed, as the majority opinion acknowledges, "[p]laintiffs' free exercise challenge presents a question of first impression for this Court."[1] *Ante*, at 33.

In addition, it is important to note the limited task before us at this juncture. Specifically, we must determine whether, at the motion to dismiss stage, plaintiffs have stated a *plausible* free exercise claim by asserting that the Act, which requires students in public or private school to be vaccinated against certain communicable diseases and maintains a secular exemption while simultaneously eliminating a religious exemption, fails to satisfy the requirements for rational basis review articulated by the Supreme Court in *Smith*, and thus must be subject to strict

---

[1] In *Phillips*, we stated that "New York could constitutionally require that *all children* be vaccinated in order to attend public school." 775 F.3d at 543 (emphasis added). However, as the majority opinion notes, that portion of our decision in *Phillips* was dictum. *Ante*, at 33 n.17. In any event, as Judge Park has correctly observed in another case, "we have never said that allowing some unvaccinated students (*i.e.*, those with medical exemptions) to mingle with their peers in schools, while excluding religious objectors, would be constitutional." *M.A. ex rel. H.R. v. Rockland Cnty. Dep't of Health*, 53 F. 4th 29, 41 n.4 (2d Cir. 2022) (Park, *J.*, concurring).

scrutiny.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (holding that, to survive a motion to dismiss, the complaint "must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))).  A determination that plaintiffs have plausibly asserted such a free exercise claim would not invalidate the Act, but rather would allow plaintiffs to conduct discovery on, *inter alia*, the disputed factual issues that bear upon what level of scrutiny should apply in reviewing the constitutionality of the Act under the Free Exercise Clause.

Under *Smith*, a state's law that burdens religious exercise avoids strict scrutiny only if it is "a valid and neutral law of general applicability."  494 U.S. at 879 (internal quotation marks and citation omitted).  A law is "not generally applicable if it is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it."  *Cent. Rabbinical Cong. of the U.S. & Can. v. N.Y.C. Dep't of Health & Mental Hygiene* (*Cent. Rabbinical Cong.*), 763 F.3d 183, 197 (2d Cir. 2014).

Here, for over fifty years, Connecticut maintained a religious exemption to the mandatory vaccination requirement for students.  Connecticut contends that

3

the Act's elimination of the religious exemption in 2021 was necessary to protect the health and safety of its schoolchildren. However, as set forth below, an analysis of the Act raises a plausible claim that it is substantially underinclusive to the extent it fails to regulate secular conduct, including by allowing an exemption to the mandatory vaccination law for students with medical objections, that is at least as harmful to the legitimate interest of promoting the health and safety of students and the public as is the religious conduct.

Although Connecticut asserts that this differing treatment between religious and secular exemptions was prompted by a substantial increase over recent years in the number of religious exemptions and an acute risk of an outbreak of disease, Connecticut fails to explain how forty-four states and the District of Columbia have maintained a religious exemption for mandatory student vaccinations without jeopardizing public health and safety. Connecticut also fails to articulate how having the "grandfather clause" in the Act that allows students with current religious exemptions to remain unvaccinated until they graduate high school (which could be over a decade if they were in kindergarten at the time of the passage of the Act) is consistent with its position that the elimination of the

religious exemption was necessary to prevent an acute risk of an outbreak of disease among students.

Moreover, while preventing unvaccinated students with religious objections from attending school to avoid the spread of disease among students, Connecticut has done nothing to address the reality that those same unvaccinated students may continue to interact with other children and the general public in numerous places outside the school setting including, for example, community sports leagues, religious gatherings, and social gatherings of all types. Nor does Connecticut deal with the fact that students will also continue to interact with unvaccinated adults, as the State does not regulate vaccination requirements for adults.

Notwithstanding these many fact-intensive questions regarding whether this law satisfies the general applicability requirement under *Smith*, the majority opinion closes the courthouse doors to plaintiffs on their free exercise claim on a motion to dismiss before any discovery and before plaintiffs had an opportunity to present evidence bearing on the general applicability requirement in this particular context. The majority opinion does so by concluding, *inter alia*, that medical and religious exemptions are not comparable for free exercise purposes

as a matter of law. Neither Supreme Court precedent nor this Court's jurisprudence allows a court to so summarily cast aside the fundamental constitutional right of individuals to the free exercise of religion. In reaching this conclusion before the development of any factual record in discovery, the majority opinion ignores two recent decisions by this Court addressing similar COVID-19 vaccination requirements. In both of these cases, we recognized that a plaintiff ultimately may be able to put forth evidence establishing that this precise type of differential treatment fails to satisfy the general applicability requirement in *Smith*—thereby subjecting the law to strict scrutiny.

Not only is the majority opinion's holding incorrect at this stage given the factual allegations in this case, but its analysis also has troubling implications for the future of the Free Exercise Clause as it relates to all types of vaccination requirements for students and other members of the public, including for COVID-19. In other words, under the majority opinion's analysis, a state or other governmental entity could expand mandatory vaccination requirements and simultaneously eliminate religious exemptions (while maintaining broad medical exemptions) and easily satisfy the low constitutional bar of rational basis review by invoking generalized concerns about public health and safety. If the allegations

6

in this case cannot survive a motion to dismiss, many other "general applicability" challenges to vaccination requirements that contain a similar secular exemption but no religious exemption, will undoubtedly suffer the same fate.

In sum, for the reasons discussed below, I conclude that plaintiffs have stated a plausible free exercise claim and the question of what level of scrutiny applies to that claim cannot be resolved at the motion to dismiss stage in this particular case. Accordingly, I would vacate the judgment of the district court and remand for further proceedings as to the free exercise claim (along with the IDEA claim) and, therefore, respectfully dissent from that portion of the majority opinion.

## DISCUSSION

The First Amendment bars the government from "prohibiting the free exercise" of religion. U.S. Const., amend. I; *see Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (incorporating the Free Exercise Clause against the states). "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Smith*, 494 U.S. at 877. "The Free Exercise Clause thus protects an individual's private right to religious belief, as well as the performance of (or abstention from) physical acts that constitute the

free exercise of religion." *Kane v. De Blasio*, 19 F.4th 152, 163–64 (2d Cir. 2021) (per curiam) (internal quotation marks and citation omitted). Therefore, "government enforcement of laws or policies that substantially burden the exercise of sincerely held religious beliefs is subject to strict scrutiny." *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002). However, under the framework established by the Supreme Court in *Smith*, "[w]here the government seeks to enforce a law that is neutral and of general applicability . . . then it need only demonstrate a rational basis for its enforcement, even if enforcement of the law incidentally burdens religious practices." *Id.* (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) & *Smith*, 494 U.S. at 878–79).

Here, there is no question that the imposition of a mandatory vaccination requirement for students to be able to attend a private or public school in Connecticut, with no religious exemption, substantially burdens the free exercise of religion. *See Trinity Lutheran Church of Columbia, Inc. v Comer*, 582 U.S. 449, 462 (2017) ("To condition the availability of benefits upon a recipient's willingness to surrender his religiously impelled status effectively penalizes the free exercise of his constitutional liberties." (alterations adopted) (internal quotation marks and citation omitted)). As to the level of review, plaintiffs argue that, because of the

existence of the medical exemption and the repeal of the religious exemption to the mandatory vaccination regime for students, the Act both lacks neutrality and general applicability and, therefore, is subject to strict scrutiny.  I agree with the majority opinion that plaintiffs have failed to plausibly allege that the Act lacks neutrality.  Plaintiffs concede that they have no particular allegations of religious animus and, instead, argue that non-neutrality is demonstrated by the elimination of the religious exemption from the Act.  As the majority opinion notes, we have held that "[t]he absence of a religious exception to a law does not, on its own, establish non-neutrality such that a religious exception is constitutionally required." *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 282 (2d Cir.) (per curiam), *opinion clarified*, 17 F.4th 266, 287 (2d Cir. 2021), and *cert. denied sub nom. Dr. A. v. Hochul*, 142 S. Ct. 2569 (2022).  I agree with the majority opinion that the repeal of a religious exemption, by itself, also does not render a statute non-neutral for purposes of *Smith*.  Given the lack of particular allegations of religious animus or hostility with respect to the passage of the Act, plaintiffs have failed to plausibly allege that the Act is non-neutral under *Smith*.

However, with regard to general applicability, I respectfully disagree with the majority opinion and would conclude that plaintiffs have plausibly alleged

that the Act lacks general applicability.[2]  The general applicability requirement in

*Smith* "protects religious observers against unequal treatment, and inequality that

results when a legislature decides that the governmental interests it seeks to

advance are worthy of being pursued only against conduct with a religious

motivation." *Cent. Rabbinical Cong.*, 763 F.3d at 196–97 (alterations adopted)

(quoting *Church of Lukumi*, 508 U.S. at 542–43).  Under *Smith*, a law is not generally

applicable if it (1) "invites the government to consider the particular reasons for a

person's conduct by providing a mechanism for individualized exemptions," or

(2) "if it prohibits religious conduct while permitting secular conduct that

undermines the government's asserted interests in a similar way." *Fulton v. City

of Philadelphia*, 141 S. Ct. 1868, 1877 (2021) (alteration adopted) (internal quotation

marks and citations omitted).  Although the Act does not raise any issue under

*Smith* with regard to a mechanism for individualized exemptions, I conclude that

---

[2] As an initial matter, I note that I agree with Judge Park's discussion in *Rockland County*
which states that "the general-applicability test embraces a purposivist approach that is
vulnerable to manipulation and arbitrariness" and "[u]ntil *Smith* is overruled, its ill-
defined test means that free-exercise rights risk being perennially trumped by the next
crisis."  53 F. 4th at 42 (Park, *J.*, concurring) (internal quotation marks and citation
omitted).  In fact, "since *Smith*, several Supreme Court justices have written or joined in
expressing doubt about Smith's free exercise jurisprudence." *303 Creative LLC v. Elenis*, 6
F. 4th 1160, 1205 n.11 (10th Cir. 2021) (Tymkovich, *C.J.*, dissenting), *rev'd*, 143 S. Ct. 2298
(2023).  In any event, *Smith* continues to be binding precedent, and I apply its framework
here.

10

plaintiffs have plausibly alleged that the Act, in repealing the religious exemption while maintaining a medical exemption, "is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it" and thus lacks general applicability under *Smith*. *Cent. Rabbinical Cong.*, 763 F.3d at 197; *see also Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 360, 365–66 (3d Cir. 1999) (holding, with respect to a "no-beard policy," "that the [Police] Department's decision to provide medical exemptions while refusing religious exemptions is sufficiently suggestive of discriminatory intent so as to trigger heightened scrutiny under *Smith* . . . .").

"[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam) (citing *Roman Cath. Diocese of Brook. v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (listing secular activities treated more favorably than religious worship that either "have contributed to the spread of COVID–19" or "could" have presented similar risks)). "Comparability is concerned with the risks various activities pose, not the reasons why people [undertake an activity]." *Id.*

11

As an initial matter, Connecticut was less than precise in describing the scope of its asserted interest at the time of the Act's passage and should not be permitted under *Smith* to rely upon *post-hoc* rationalizations. *See Doe 1-3 v. Mills*, 142 S. Ct. 17, 20 (2021) (Gorsuch, *J.*, dissenting from the denial of application for injunctive relief related to regulation mandating COVID-19 vaccinations for Maine healthcare workers) (explaining that "when judging whether a law treats a religious exercise the same as comparable secular activity, this Court has made plain that only the government's *actually asserted* interests as applied to the parties before it count—not *post-hoc* reimaginings of those interests expanded to some society-wide level of generality"). As the majority opinion acknowledges, Connecticut maintained in the district court that its interest in the Act was to "protect the health and safety of Connecticut's schoolchildren," *We the Patriots USA, Inc. v. Connecticut Off. of Early Childhood Dev.*, 579 F. Supp. 3d 290, 307 (D. Conn. 2022) (internal citation omitted), and reasserted that same interest at oral argument in this Court, Oral Argument at 11:21, 19:34, *We the Patriots* (No. 22-249). At other times in its appellate papers, Connecticut has broadened that interest to also include protecting the health and safety of the general public. In any event, even adopting the broader articulation of Connecticut's asserted interests in the

Act (as the majority opinion does), the failure to regulate secular conduct in the form of medical exemptions while regulating religious conduct raises substantial questions regarding whether the Act meets the general applicability requirement under *Smith*, which should not be decided on a motion to dismiss.

To the extent the asserted interest justifying the Act is the prevention of the spread of communicable diseases among Connecticut students entering a school, it is obvious that an unvaccinated student with a medical objection who is allowed to attend school poses the same health risk to another student as an unvaccinated student with a religious objection. To be sure, the majority opinion is correct that we have emphasized that the analysis need not be limited to "a one-to-one comparison of the transmission risk posed by an individual [with a religious exemption] and . . . an individual [with a medical exemption]," to ascertain comparability for general applicability purposes. *Hochul*, 17 F.4th at 287; *see also Ante*, at 46–49. Thus, the majority opinion focuses on "aggregate data about transmission risks." *Ante,* at 47 (internal quotation marks and citation omitted). However, even when comparing the relative risks of the two groups of unvaccinated students in the aggregate, substantial factual questions remain as to whether the comparative risk of harm to other students posed by students

13

unvaccinated due to religious objections is materially greater than that posed by students unvaccinated due to medical objections.

Connecticut cites limited data in its brief in support of its argument that the risks posed by the two groups are not comparable for free exercise purposes. In particular, it relies on data attached to the complaint, which shows that from 2019 to 2020, 2.3% of kindergarteners claimed a religious exemption to Connecticut's vaccine requirements while only 0.2% of kindergarteners claimed a medical exemption. *See* Appellee's Br. at 3–4, 38. The majority opinion acknowledges that this aggregate public health data that plaintiffs presented in an appendix to the complaint "is *sparse*." *Ante*, at 50 (emphasis added). The majority opinion then seeks to bolster this sparse record by utilizing legislative history, including comments by legislators who "spoke of the need to avoid 'a real public health crisis.'" *Id.* at 45 (quoting Connecticut General Assembly House Proceedings, H.B. 6423, 2021 Sess., at 847 (Conn. 2021)). For example, the majority opinion notes that "[i]n school years 2018-19 and 2019-20, more than ten times as many kindergartners claimed religious exemptions compared to medical exemptions." *Id.* at 51. The majority opinion further notes that these statistics reflect that "[t]he overall trend was toward an increase in religious exemptions," while medical

14

exemptions remained constant. *Id.* at 9. Based on the threadbare data and unsupported statements in the legislative history, the majority opinion leaps to the legal conclusion "that religious and medical exemptions are not comparable in reference to the State's interest in the health and safety of Connecticut's children and the broader public," *id.* at 55, in part, because "the Legislature reasonably judged that the risk of an outbreak of disease was acute, even if not necessarily imminent, and that continuing to permit religious exemptions, the State's only kind of nonmedical exemption, to multiply would increase that risk," *id.* at 51.

The limited statistics in the "sparse record" hardly compel the conclusion as a matter of law that the aggregate risks associated with medical exemptions are not comparable to religious exemptions because of the increasing number of students seeking religious exemptions. As an initial matter, the percent of kindergartners claiming religious exemptions actually dropped (albeit slightly) from the 2018-19 school year compared to the 2019-20 school year. In any event, the increase of religious exemptions over the last ten years, by itself, does not demonstrate that the risks associated with such exemptions are no longer comparable to the medical exemptions. Much more data and expert opinion would be necessary to engage in a meaningful analysis of the comparable risks,

such as the levels of herd immunity for various illnesses that are the subject of the immunization requirements and whether the increase in exemptions has had any meaningful impact in Connecticut on such herd immunity. That type of fact-intensive analysis should not be conducted, as the majority opinion does, on a sparse record at the motion to dismiss stage.

In addition, the majority opinion does not explain why, if Connecticut's interest in repealing a decades-old religious exemption is justified by an acute risk of outbreak of disease among children and "a real public health crisis," *id.* at 14, 45, it would enact a law that still allows students with current religious exemptions, from kindergarten to the 12th grade, to be "grandfathered in" and continue to attend school unvaccinated until they graduate from high school. In other words, under the Act, the purportedly large number of kindergartners with religious exemptions from the 2019 to 2020, upon which Connecticut relies to demonstrate an alarming increase in religious exemptions that risks an acute outbreak of disease, will be permitted to continue to attend school while unvaccinated for over a decade. *See* Public Act 21-6 § 1(b).

Moreover, although the Act may successfully keep students who are unvaccinated due to religious objections out of public and private schools, it does

nothing to eliminate the comingling of those unvaccinated students with children (including those unvaccinated for medical reasons), in any other place of assembly including church, community sports events, restaurants, or any other social setting where children tend to gather.  For this same reason, the Act appears to be substantially underinclusive to the extent it is aimed at the risk of disease purportedly created by "clustering."  Appellees' Br. at 4 n.1.  As described by Connecticut, "clustering," is "a phenomenon whereby individuals with religious objections to vaccines tend to cluster in particular communities, causing that community's vaccination rate to be especially low." *Id.*  However, the students who refuse to be vaccinated for religious reasons even after passage of the Act and are clustered in a particular community and homeschooled, will likely continue to interact not only with each other, but also (as noted above) with children outside the clustered community in all types of public settings.

Even if Connecticut's interest is broadened to extend to the health and safety of the public in general, substantial questions remain regarding the Act's ability to satisfy the general applicability requirement in *Smith*.  For example, even if the Act is successful in compelling religious objectors to vaccinate their children in order to be able to send them to school, the Act does not cover unvaccinated adults, who

17

(whether clustered or not) could spread diseases and substantially undermine the State's asserted public health goal in eliminating the free exercise rights of students in this context.

Connecticut's assertion (adopted by the majority opinion), that the aggregate risk of disease to schoolchildren posed by religious exemptions is acute compared to the much lower risk posed by medical exemptions, also overlooks the fact that currently forty-four states, as well as the District of Columbia, have a religious exemption to state laws requiring children attending public school to be vaccinated. *See* Nat't Conf of State Legislatures, *States With Religious and Philosophical Exemptions From School Immunization Requirements*, https://www.ncsl.org/health/states-with-religious-and-philosophical-exemptions-from-school-immunization-requirements (last updated May 25, 2022). That data suggests that the harm posed to students by religious exemptions to vaccination requirements may, indeed, be comparable to the harm posed by non-religious exemptions.

The majority opinion sidesteps many of these questions by suggesting that "exempting a student from the vaccination requirement because of a medical condition and exempting a student who declines to be vaccinated for religious

18

reasons are not comparable in relation to the State's interest" because, *inter alia*, the medical exemption allows students "to avoid the harms that taking a particular vaccine inflict on them." *Ante*, at 48–49. That assertion, however, seems to ignore the fact that a medical exemption, which may support the State's interest in one way (namely, avoiding any harm to that student from the vaccination), may also undermine the State's interest in another way that is similar to the impact of a religious exemption (namely, avoiding the spread of disease in schools).

Furthermore, the student with the medical objection to vaccinations can avoid that harm *and* other schoolchildren would be protected from disease if the student with the medical objection was not exempt and was left with the option of being homeschooled, which is now the only option under the Act available for students with a religious objection. In other words, the statute at issue here is not a mandatory vaccination requirement for children at large, but rather for children attending public or private schools. Thus, the State's asserted interest in protecting schoolchildren from the spread of disease by unvaccinated students and its corresponding interest in not mandating a vaccine that would cause medical harm to certain students are *both* furthered if the Act treats medical objectors in the same manner as religious objectors and does not allow medical objectors into the school.

19

Therefore, contrary to the majority opinion's analysis, a mandatory vaccination statute that excludes religious objections, but provides an exemption to students with medical objections, does not automatically avoid a general applicability issue under *Smith* simply by pointing to concerns about avoiding medical harm to a student from the vaccine.

Indeed, this Court has recently acknowledged, on two separate occasions, that a compulsory vaccination law or regulation, which does not include a religious exemption but has a medical exemption, may raise potential general applicability problems under *Smith*. The first instance was in *We the Patriots USA, Inc. v. Hochul,* where although we determined that a preliminary injunction against New York's emergency rule was not appropriate, we noted that a general applicability problem may arise after further fact development. 17 F.4th at 287–88. The second occasion was in *M.A. ex rel. H.R. v. Rockland Cnty. Dep't of Health,* when we decided that summary judgment in favor of the county was unwarranted because the record contained factual disputes as to, *inter alia*, whether the law at issue was generally applicable under *Smith*. 53 F. 4th 29, 38–39 (2d Cir. 2022).

In *Hochul*, we reviewed two cases in tandem, both concerning New York's emergency rule requiring healthcare facilities to ensure that their employees were

20

vaccinated against COVID-19 and containing a medical exemption but no exemption for religious objectors. 17 F.4th 266. Plaintiffs, in each of those cases, brought an action claiming, *inter alia*, that the emergency vaccination rule violated the Free Exercise Clause and moved for a preliminary injunction. *Id.* at 277–79. One district court granted the preliminary relief requested, enjoining the rule insofar as it prevented healthcare workers from being eligible for an exemption based on religious belief; the other denied it. *See A. v. Hochul*, 567 F. Supp. 3d 362 (N.D.N.Y. 2021) (granting preliminary injunction); *We the Patriots USA, Inc. v. Hochul*, No. 21-cv-4954, 2021 WL 4048670 (E.D.N.Y. Sept. 12, 2021) (denying preliminary injunction). On appeal, we reversed the grant of the preliminary injunction relating to the emergency rule and affirmed the denial of the preliminary injunction in the tandem case. *Hochul*, 17 F.4th at 296.

In doing so, although we determined that a preliminary injunction was not appropriate at that early stage, we left open the possibility that further development of the record, including information about the risks posed by the two types of exemptions and the number of each type of exemption claimed, may raise a general applicability problem. *Id.* at 286–88. In particular, we concluded that "[w]ith a record as undeveloped on the issue of comparability as that presented

here, we cannot conclude that the above vaccination requirements are *per se* not

generally applicable . . . so as to support a preliminary injunction." *Id.* at 287–88.

However, we also noted, because "[t]he record before us contains only limited data

regarding the prevalence of medical ineligibility and religious objections," *id.* at

287, the risks associated with medical exemptions and religious exemption "may,

after factual development, be shown to be too insignificant to render the

exemptions incomparable," *id.* at 286. Therefore, far from suggesting that a

compulsory vaccination with a medical exemption, but not a religious one, is

generally applicable as a matter of law, we recognized that fact-finding regarding

the comparability of the two exemptions could be critical to determining whether

such a law is generally applicable. *See also Cent. Rabbinical Cong.*, 763 F.3d at 197

(vacating denial of preliminary injunction involving a free exercise claim because,

*inter alia*, "[i]n light of the sparse record at this preliminary stage, we cannot

conclude that [the Ordinance at issue] is generally applicable"); *Bosarge v. Edney*,

No. 22-cv-233, 2023 WL 2998484, at *10 (S.D. Miss. April 18, 2023) (granting

preliminary injunction preventing enforcement of Mississippi's compulsory

vaccination law requiring students to be vaccinated in order to attend public and

private schools in the State and explaining that "[b]ecause the evidence shows that

22

there was a method by which Mississippi officials could consider secular exemptions, particularly medical exemptions, [but not religious objections,] their interpretation of the Compulsory Vaccination Law would not be neutral or generally applicable").

More recently, in *Rockland County*, we explicitly confirmed the need for a fully developed record at trial on the comparable risks associated with religious and secular exemptions, in order to determine the general applicability of a law involving compulsory vaccinations for children. 53 F.4th at 38–40. More specifically, we held that fact issues precluded summary judgment in a Free Exercise Clause challenge to an emergency declaration that barred unvaccinated children from places of public assembly, other than those with medical exemptions. *Id.* at 39. In that case, the parents of minor children brought an action against the Rockland County Department of Health and several Rockland County officials asserting various claims, including a violation of the Free Exercise Clause, based on orders that excluded children who were not vaccinated against measles from attending school and an emergency declaration that barred unvaccinated children, other than those with medical exemptions, from places of public assembly. *Id.* at 32–33. The defendants moved for summary judgement,

23

which the district court granted, determining that the challenged restrictions did not violate the Free Exercise Clause because *Phillips* "expressly held that 'mandatory vaccination as a condition for admission to school does not violate the Free Exercise Clause.'" *W.D. v. Rockland County*, 521 F. Supp. 3d 358, 405 (S.D.N.Y. 2021) (quoting *Phillips*, 775 F.3d at 543).

On appeal, however, we reversed, holding as to the general applicability prong that the defendants presented insufficient evidence about, *inter alia*, the purpose and scope of the emergency declaration. *Rockland Cnty. Dep't of Health*, 53 F.4th at 39. We decided that that the record was undeveloped as to "what governmental interest the Declaration was intended to serve, which [was] relevant to the question of whether the Declaration was 'substantially underinclusive,' and therefore, not generally applicable." *Id.* (citing *Hochul*, 17 F.4th at 284–85). We noted that "Rockland County's interest in issuing the Declaration could [have been] to stop the transmission of measles, which [could] lead a factfinder to question why there was a medical exemption, where . . . medically exempt children are every bit as likely to carry undetected measles as a child with a religious exemption and are much more vulnerable to the spread of the disease and serious health effects if they contract it." *Id.* (alteration adopted) (internal

24

quotation marks and citation omitted).  We further noted, "[o]n the other hand . . . the purpose of the Declaration could be to encourage vaccination."  *Id*.  In such a situation, we concluded that what animates a seemingly facially neutral regulation that appears to be underinclusive is a "fact-intensive question that should be explored at trial through the examination of evidence that supports or undermines" the various potential purposes.  *Id.*  Accordingly, we held that, "because factual questions about the Emergency Declaration pervade the issues of neutrality and general applicability, the question of what level of scrutiny applies cannot be resolved on summary judgment, and Defendants fail to meet the high burden required to prevail at this stage."[3]  *Id.*

Notwithstanding this precedent and the many factual and legal questions regarding the general applicability prong in this particular case, including the imprecise nature of Connecticut's asserted interest in regulating religious conduct in this manner, the majority opinion concludes as a matter of law, at the motion to dismiss stage, that medical exemptions and religious exemptions are not

---

[3] I agree with the majority that *Rockland County* also contained facts regarding potential anti-religious animus, which impacted the neutrality prong of the *Smith* test, and are absent in this case.  *See Ante*, at 31–32.  However, our denial of summary judgment on the general applicability prong in *Rockland County* was separate and independent from the evidence of anti-religious animus supporting the plaintiffs' claim on the neutrality prong in that case.

comparable for free exercise purposes in the context of this mandatory vaccination statute.  The majority does so even though it concedes that the aggregate health data supporting such a distinction is "sparse," and even though a remand would not only provide Connecticut with an opportunity to more clearly articulate its asserted interests in regulating religious conduct in this context, but also would also allow plaintiffs the opportunity to engage in discovery regarding why Connecticut asserts that allowing medically exempt children to attend school poses a lower risk of spreading communicable diseases than allowing religiously exempt children would.  This would require further fact-finding about, among other things, the number of students trying to claim a religious exemption, who would not be subject to the legacy provision, versus the number trying to claim a medical exemption.  Such information may help uncover the comparable risks and threats posed to school children by the two classes of exemptions.  In addition, facts concerning the impact on herd immunity levels based on the number and types of exemptions being claimed would further help explain if the two exemptions are comparable in light of the asserted interest.[4]  Obviously, after

---

[4] The majority opinion quotes Governor Lamont who stated upon the signing of the Act that "[t]his legislation is needed to protect our kids against serious illnesses that have been well-controlled for many decades, such as measles, tuberculosis, and whooping cough, but have reemerged."  *Ante*, at 44 (internal citation omitted).  However, it is

gathering such discovery from Connecticut, plaintiffs would have the opportunity to submit any evidence to the district court at summary judgment undermining Connecticut's position.

I emphasize that, after such discovery, plaintiffs may be unable to demonstrate that the risks associated with religious and medical exemptions under the Act are comparable, and the district court may conclude that the Act falls within the broad ambit of public policy that satisfies rational basis review. Moreover, even if plaintiff demonstrates that the Act lacks general applicability following discovery, Connecticut will have the opportunity to argue that the Act survives strict scrutiny. At this stage though, I narrowly conclude that it was error for the district court to find the free exercise claim implausible as a matter of law

---

entirely unclear from the record at this juncture that these serious illnesses have re-emerged in a substantial way in Connecticut. For example, according to the Connecticut State Department of Health, with respect to confirmed cases of measles in Connecticut, there were four cases in 2019, zero cases in 2020, and two cases in 2021. Conn. State Dep't of Pub. Health, *Case Occurrence of Selected Diseases (Connecticut)*, https://portal.ct.gov/DPH/Immunizations/Case-Occurrence-of-Selected-Diseases-Connecticut (last visited July 19, 2023). Moreover, there was also at least one confirmed measles case in Connecticut in 2010, 2011, and 2012, all of which were before the purported concern regarding the material increase in religious exemptions. *Id.* Furthermore, while justifying the repeal of religious exemptions based on this articulated concern about the risk of re-emergence of illnesses caused by the increasing number of those exemptions, the Act actually *expanded* medical exemptions so as to allow reasons that are "not recognized by the National Centers for Disease Control and Prevention" but that "in [the provider's] discretion results in the vaccination being medically contraindicated." Public Act 21-6 § 7.

by making that critical fact-intensive determination on a sparse record before plaintiffs have had the opportunity to conduct discovery or to present evidence supporting their position on this issue to the court.

The majority opinion's analysis not only extinguishes the free exercise rights of Connecticut schoolchildren in the context of this Act, but has much broader ramifications for free exercise rights of individuals in the context of vaccine mandates more generally. The mandatory vaccinations required under the Act are not limited to illnesses like measles, tuberculosis, and whooping cough. Rather, the requirement extends to other illnesses, including a mandatory flu vaccination for students. Public Act 21-6 § 1(a) (requiring "each child to be protected by adequate immunization against diphtheria, pertussis, tetanus, poliomyelitis, measles, mumps, rubella, haemophilus influenzae type B and any other vaccine required by the schedule for active immunization adopted pursuant to section 19a-7f"). Thus, if Connecticut or any other state or government entity were to determine that mandatory COVID-19 vaccines for students were necessary in the future, Connecticut could do so without providing any religious exemption and survive rational basis review by invoking generalized concerns about the need to protect the health of students and the general public.

28

The majority opinion's analysis is also not limited to schools. Any vaccination mandate imposed by a governmental entity upon its employees, or even its residents, would be analyzed with the low constitutional bar of rational basis review even if it had a medical exemption but no exemption for objections based upon sincerely held religious beliefs. Therefore, challenges to any such mandatory vaccination laws, whether for COVID-19 or any other illness which the government deems sufficiently serious to warrant mandatory vaccinations in the future, would similarly be unable to survive a motion to dismiss on general applicability grounds under the majority opinion's analysis once the government invoked generalized concerns about public safety. Such an approach allows the fundamental right of the free exercise of religion to be swept away under the mantle of rational basis review without any meaningful factual inquiry as to whether the differing treatment between the secular exemption and the religious exemption is warranted, even where a religious exemption has existed under the laws of a state for decades. This narrowing of judicial review of the government's decision to regulate religious conduct in the name of public health, while simultaneously allowing the same conduct for one or more secular reasons, is extremely troubling and inconsistent with the important religious rights enshrined

29

in the Free Exercise Clause. *See generally Roman Cath. Diocese* , 141 S. Ct. at 68 ("Members of this Court are not public health experts, and we should respect the judgment of those with special expertise and responsibility in this area. But even in a pandemic, the Constitution cannot be put away and forgotten.").

Instead, consistent with the jurisprudence of the Supreme Court and this Court, we should allow plaintiffs in such situations, before they are stripped of their free exercise rights, the basic opportunity of discovery to attempt to show that the *Smith* standard has not been met and, therefore, that such a law should be subject to strict scrutiny.

Accordingly, I respectfully dissent from the portion of the majority's opinion in Section I Parts B(2)(b) and B(3) where it holds, as matter of law at the motion to dismiss stage, that the Act does not lack general applicability and affirms the dismissal of the free exercise claim under rational basis review.